PHŒNIX MANUFACTURING COMPANY, Respondent, vs. WHITE
and wife, Appellants.
SAME, Appellant, vs. SAME, Respondents.

*March 15—April 23, 1912.*

*Injunction: Contracts: Exclusive right to manufacture patented ar-
ticle: Parties: New contract superseding former one: Husband
and wife: "Improvements" on patented machine: Right to use:
Estoppel: Trade-names: Restraining use of man's own name:
Unfair competition.*

1. In an action to establish an exclusive right to manufacture and
   sell certain saw swages patented by defendant, and to enjoin
   him from manufacturing and selling similar machines in viola-
   tion of his contract under which plaintiff claims, the defend-
   ant's wife, who is the record owner of the patent, is a proper,
   if not a necessary, party.
2. The inventor of a saw swage gave to a corporation, by contract,
   an exclusive right to manufacture and sell such swage, together
   with the inventions and improvements on the same which had
   been or might be invented. Afterwards the patent on the swage
   was formally transferred to the inventor's wife, but without
   consideration and without intention to make any practical dif-
   ference in the ownership and control thereof by the husband.
   A new contract, signed by the wife and differing in some re-
   spects from the former one, was then made with the corpora-
   tion, which in terms declared that it should supersede all other
   and former contracts respecting such swage. Thereafter the
   manufacture and sale went on as before, royalties being paid
   to the wife, with the husband's knowledge, and deposited to the
   credit of a bank account in her name, upon which, however,
   checks were drawn by husband and wife indiscriminately.
   *Held,* that the second contract was to all intents and purposes
   the contract of the inventor, so far as the corporation was con-
   cerned, and that it superseded the earlier contract.
3. A new saw swage invented and patented by the same inventor,
   but designated in the specification of the patent as an improve-
   ment on the former machine and so treated by the parties for a
   number of years, was an "improvement" covered by the con-
   tracts giving the corporation exclusive rights of manufacture
   and sale.

4. The inventor having invented a third saw swage of similar char-
acter but with some changes, and the corporation having, after
some discussion and negotiation, agreed that he might manu-
facture and sell such new swage himself, and having allowed
him thereafter to proceed to make patterns and models in its
shop at a considerable cash outlay, paid to it by him, with full
knowledge of his intention to use such patterns and models in a
shop of his own in manufacturing the new swage, the corpora-
tion was estopped from claiming any right, by virtue of its con-
tract, to manufacture and sell such third swage.

5. A man's name is his own property and he has the right to every
honest and fair use of it in his business, but he cannot resort
to artifice or use it in such manner as to mislead the public in
respect to the identity of another business firm or establishment
or the article produced by it, and thus cause injury to such
other beyond that which results from the mere similarity of
name.

6. Thus, where a man named White invented a saw swage and
granted to plaintiff the exclusive right to manufacture and sell
the same and any improvements thereon, and plaintiff had, with
his knowledge and consent, put such invention and an improved
form thereof upon the market under the names of the "White
Swage," "New White Swage," and "Improved White Swage,"
and had at great expense and by efforts extending over a num-
ber of years established a reputation and demand for the ar-
ticle, such inventor was properly enjoined, at the instance of
the plaintiff and upon proof of actual injury to its trade by de-
ception of customers, from advertising and selling another
swage of his own later invention under such names or any
combination thereof, including the name "New Improved White
Swage." *Fish Bros. W. Co. v. La Belle W. Works,* 82 Wis. 546,
explained and distinguished. SIEBECKER, KERWIN, and TIM-
LIN, JJ., dissent.

APPEALS from a judgment of the circuit court for Eau
Claire county: JAMES WICKHAM, Circuit Judge. *Modified
and affirmed.*

This is an action in equity to establish and enforce by in-
junction an exclusive right on the part of the plaintiff to
manufacture and sell certain patented saw swages, invented
and patented by the defendant *Albert E. White,* and to enjoin
said *White* from manufacturing or selling any saw swage

equipped with certain specified parts, and from advertising for sale any saw swage under the name "White Saw Swage," or any similar name. A saw swage is a hand machine used for spreading or broadening the cutting surface of the teeth of rotary, band, or other saws at the point and for a little distance below the point. This is done by placing the machine on the edge of the saw so that the tooth to be swaged comes between two steel dies, one of which is stationary and is called the anvil die, and the other is a movable eccentric die, both of which are set firmly in a circular steel block. By means of a lever the eccentric die is pressed with great force against the cutting surface of the tooth, the back of which rests against the anvil die, and thus the point of the tooth is broadened.

In November, 1896, the defendant *Albert ·E. White* had perfected an improved saw swage and applied for a patent thereon, which patent was actually issued to him August 3, 1897, and numbered 587,539, and is hereafter called the first patent. November 18, 1896, a contract was made between *White* and the plaintiff by which *White* granted to the plaintiff

"the exclusive right to manufacture and sell throughout the United States, its Territories and the Dominion of Canada, the said saw swages, together with the inventions and improvements on same which have been or may be invented, and for which letters patent are now pending or may hereafter be issued to him in the United States and the Dominion of Canada for improvements in saw swages and attachments thereto to the full end and term for which any patent may be issued thereon, subject to the limitations and conditions hereinafter named."

By this contract *White* also agreed as follows:

"faithfully to devote his services and skill as inventor to perfecting and completing the said invention and improvements and to use his best endeavors to introduce the same for sale and use and to make the same efficient and successful in operation, and to create the best possible demand and market

for his said invention and improvements to the end and pur-
pose that the manufacture and sale thereof may be made as
profitable and extensive as he may do by the exercise of his
best efforts and skill in that behalf.

"And the said *A. E. White* further agrees in consideration
of this agreement and his salary hereinafter mentioned as the
agent of the said party of the second part, and under its di-
rection as workman and traveling salesman, to sell and intro-
duce the saw swages and invention and improvements thereon
and also any other articles of manufacture as requested by the
said party of the second part, by the exercise of his best skill
and ability as such workman, salesman or agent, and that he
will faithfully devote his time, ability and services in and
about the introduction and perfection of said invention and
improvements thereon for the best interests of the business of
said *Phœnix Manufacturing Company.*"

The contract further provided that the plaintiff should
manufacture and sell the said patented swages and the im-
provements thereon, and pay a royalty to *White* of $5 for
each swage sold; that the agreement might be canceled by
either party by six months' written notice at any time; and
that *White* should be employed as traveling agent and sales-
man by the plaintiff for one year at a salary of $1,000, sub-
ject to the right of either party to terminate the employment
by giving thirty days' notice to the other.

Upon the making of this contract the plaintiff entered on
the manufacture and sale of the machine, and successfully
prosecuted the business and made regular payments of royal-
ties to *White* as agreed. *White* also went to work under the
contract, and continued to travel and make sales for the plaint-
iff with no formal renewal of the contract until July 30, 1899,
at which time he quit such employment by mutual consent and
went to Louisiana, intending to engage in the lumber business
there, but abandoned that intention and returned to Eau
Claire, and on September 5, 1899, resumed his employment
with the plaintiff at an increased salary, and so remained until
August 22, 1908, when he finally left. In August, 1899,

*White* assigned his interest in the patent to one C. B. Daniels, then president of the plaintiff company, as security for mon- eys which it was expected that Daniels would advance to him to be used in the Louisiana business, but as no advancements were ever made, Daniels on September 7, 1899, at *White's* re- quest, assigned the patent to the latter's wife, *Georgianna M. White*. Both assignments were made without consideration. On September 9, 1899, *Georgianna M. White* entered into a written contract with the plaintiff with reference to the future manufacture of the swage, which the plaintiff alleges was made at the request of and with the consent of *White*. *White* denies that the last named contract was made at his request, or that he had anything to do with it except to carry a message from the plaintiff to his wife about it. The court, however, found that it was made at *White's* request, and it was abun- dantly proven not only that the contract was made at his re- quest, but that he conducted the negotiations, while his wife simply signed it because the patent stood in her name. This second contract, after reciting the issuance of the patent and its transfer to *Georgianna,* grants to the plaintiff the exclusive right to make and sell the swage, "together with the inven- tions and improvements on the same which are or may be in- vented or added thereon, and attachments thereof, to the full end of the term of said patent," subject to the conditions thereafter named. The contract further provided for the same royalty as before, and that the plaintiff would not man- ufacture or sell any other saw swage while manufacturing the *White* swage, and that in case it should not sell at least 100 each year, or at its option pay the contract royalty for 100, the said *Georgianna* might, at her option, terminate the license by six months' written notice. By the final clause of this agreement it was provided that it should "supersede and take the place of all other or former contracts or agreements made respecting said patented saw swages or improvements."

After the making of this contract the manufacture and

sale of the swage by the plaintiff went on as before, and the royalties were paid by check to the order of *Georgianna M. White,* with the full knowledge and consent of *White. Mrs. White* testifies that the checks were all deposited to the credit of her account in the bank (*Mr. White* never having kept an account of his own), and that checks were drawn on that account by herself and her husband indiscriminately. *Mr. White* continued in the plaintiff's employment, his work being enlarged from time to time so as to cover the making of plans and specifications for mill outfits and getting orders for the same, but he incidentally also sold the swages. In the fall of 1904, and while still at work for plaintiff, he designed a new swage and applied for a patent thereon, which was finally issued to him April 3, 1906, numbered 816,695, and which will be hereafter called the second patent. The specification of this second patent declares that the "invention relates to devices for swaging the teeth of band, gang, and circular saws, and is designed as *an improvement over the swage device* shown and described in letters patent of the U. S. No. 587,539, issued to me August 3, 1897." In this second patent the dies were not changed, nor their operation, but there was added a frame so that the block containing the dies was supported on the edge of the saw, combined with a slotted semi-circular arch above the saw furnished with stop pins for regulating the distance to be traveled by the lever, which was forked so that the handle was directly above and in the plane of the saw, thus insuring a direct pressure instead of a one-sided pressure, as in the case of the former lever. After the perfecting of this second invention, it was manufactured by the plaintiff, advertised, and sold by and with the knowledge and consent of the defendant *White* as the "New White Saw Swage," and the same royalty was paid to *Mrs. White* on each of the improved swages as on the old. *White* claims that this use was permissive only, and under a verbal agreement with Mr. C. B. Daniels (now deceased), which contemplated a definite agreement

in the future, but as Mr. Daniels died before the commencement of this action *Mr. White* was not allowed to give any evidence of such an agreement, and no other witness gave any such evidence.

The court found that the two *Whites* and the plaintiff, from October, 1904, until August, 1908, treated the swages covered by the second patent as merely an improvement on the swages covered by the first patent and as one of the improvements covered by the terms of the second contract; that relying on this understanding the plaintiff spent large sums of money, extensively advertised and catalogued both machines, describing the machines made under the second patent as "New White Swages" and "Improved White Swages;" that *Mr. White* himself knew of and wrote the introduction to the catalogue, and that the plaintiff had thus built up a trade, and such swages had become generally known to the trade throughout the United States and Canada as "White Swages," "New White Swages," and "Improved White Swages." It further appears by the testimony that in August, 1908, *White* invented another improved saw swage, and made application for a patent thereon, which application was still pending in the United States patent office at the time of the trial, though a patent had been granted thereon in Canada, March 1, 1910. In this third machine both dies are set in a different way in the block, and the eccentric die is of somewhat different shape, the slotted arch and pins and forked lever are used, and there are new adjustable spring brackets for supporting the frame of the machine on the saw teeth, also a pivoted guide. With regard to this invention there was some difference of opinion between the parties, Mr. Daniels being of opinion that the plaintiff was entitled to manufacture it under the former contract as an improvement. After some discussion and negotiations it was agreed that *White* might resign his employment and himself engage in the manufacture and sale of swages under his last invention, and *White* thereupon resigned and

devoted his time for a number of months to making patterns and models of the third invention in the plaintiff's shop, and paid the plaintiff considerable sums for the shop work, etc., the plaintiff knowing that *White* intended to himself manufacture and sell the new swage from the models so made, but not knowing that he proposed to sell them under the name "New Improved White Swage," or any name incorporating the word "White" therein. *White,* in April, 1909, engaged in the manufacture of swages under the third invention, and began to distribute in the United States and Canada catalogues describing his swages as the "New Improved White Swages," and used the word "White" as a trade-mark on the machine itself. The catalogue announced that *White* had severed his connection with the plaintiff, and designed an entirely new line of swages to be marketed and sold under his own name and to be known as the "New Improved White;" that they contained radical changes and improvements, and did not contain any important feature or part of the White swages made and sold by the plaintiff. The trial court found that considerable confusion had been caused by the issuance of this catalogue, that orders from customers for swages that were intended for the plaintiff were addressed and sent to *White,* and that the use of the word "White" or the words "New Improved White" by the defendant is likely to deceive the plaintiff's customers in the purchase of saw swages, and also tends to confuse purchasers as to which swage is intended, and is in fact injurious to the plaintiff's trade and business.

From the foregoing facts the court concluded (1) that the plaintiff acquired and had the exclusive right to manufacture and sell in the United States and Canada the saw swages covered by the first and second patents according to the terms of the second contract aforesaid; (2) that the defendant had the lawful right to manufacture and sell the saw swage invented by him in August, 1908, and that the plaintiff was estopped from claiming any right to manufacture or sell the same; and

(3) that the use by defendant *White,* in advertising or describing the swages made by him, of the words "White Saw Swages," "New Improved White Swages," and the word "White" in describing the same, or as a trade-mark thereon, tends to deceive plaintiff's customers and is in violation of plaintiff's right, and that plaintiff is entitled to an injunction restraining the said *White* therefrom, but not from carrying on the business of manufacturing or selling swages in his own name.

Judgment was entered substantially according to the finding. That part thereof which enjoined the defendant *White* from advertising and selling his swages under the name "White Saw Swage" and other kindred names is as follows:

"It is further ordered, adjudged and decreed, that the defendants and each of them, their agents and servants, in advertising or selling any swage or device designed or intended as a swage of saws be, and they are hereby, perpetually enjoined, restrained and forbidden from using in any manner as a trade-mark or trade-name, or as a name designating any such swage or device, the words "White Saw Swage," "Improved White Saw Swage," or "New Improved White Saw Swage," or the word "White" with or without other words of designation; but the defendants and each of them may use his or her own name in carrying on or conducting the business of such defendant in the manufacture or sale of any swage which such defendant has a right to manufacture or sell, and may use such name or any portion thereof as the name or as a portion of the name of any firm or corporation with which such defendant may be associated in such business, and if such be the fact, may advertise that the defendant, *Albert E. White,* is the inventor of the swage so manufactured or sold, provided that said defendants shall not use as such firm or corporation name the words "White Saw Swage," "Improved White Saw Swage," or "New Improved White Saw Swage," nor any of said combination of words either with the word "Company" added or the word "Saw" omitted, and said defendants shall not by any artifice use any other firm or corporate name in such manner as to be an advertisement of swages under the names herein prohibited."

The defendants appeal from those parts of the judgment, enjoining them from manufacturing swages under the first two patents and from that part of the judgment enjoining them from the use of the word "White" as a trade-mark or in the description of saw swages manufactured and sold by them. The plaintiff appeals from that part of the judgment which determines that the defendant has a right to manufacture and sell saw swages under the invention of 1908.    The defendant, *Georgianna M. White* originally interposed a separate demurrer to the complaint, on the ground that no cause of action was stated against her, and this demurrer having been overruled on the ground that she was a proper party to the action, she adopted the answer of *Albert E. White* as her own, and the case proceeded at once to trial.    She now claims error in overruling her demurrer, in addition to her contentions on the merits of the case.

For the plaintiff there was a brief by *Bundy & Wilcox,* and oral argument by *C. T. Bundy.*    Upon the subject of unfair competition they cited 28 Am. & Eng. Ency. of Law (2d ed.) 408–429; *Oppermann v. Waterman,* 94 Wis. 583, 69 N. W. 569; *Listman M. Co. v. W. Listman M. Co.* 88 Wis. 33, 60 N. W. 261; *Fish Bros. W. Co. v. La Belle W. Works,* 82 Wis. 564, 52 N. W. 595; *Howe S. Co. v. Wyckoff, S. & B.* 198 U. S. 118, 25 Sup. Ct. 609; *Singer Mfg. Co. v. June Mfg. Co.* 163 U. S. 169, 11 Sup. Ct. 1002; *Sheffield-King M. Co. v. Sheffield M. & E. Co.* 105 Minn. 315, 117 N. W. 447.    They also contended that plaintiff controlled the fundamental invention, hence defendant had no right to manufacture his third machine which utilized improvements covered by the earlier patents, citing *O'Reilly v. Morse,* 15 How. 62; *Thomson-Houston E. Co. v. Ohio B. Co.* 80 Fed. 712.

For the defendants there was a brief by *Flanders, Bottum, Fawsett & Bottum,* attorneys, and *James G. Flanders,* of counsel, and oral argument by *Mr. Flanders* and *Mr. C. E.*

*Munroe.* They argued, *inter alia,* that the courts will not enforce specific performance of revocable contracts. *Ulrey v. Keith,* 237 Ill. 284, 86 N. E. 696; *Excelsior W. P. Co. v. Pacific B. Co.* 185 U. S. 282, 22 Sup. Ct. 681; *Victor T. M. Co. v. The Fair,* 123 Fed. 424; Pomeroy, Spec. Perf. sec. 289; *Marble Co. v. Ripley,* 10 Wall. 339, 359; *Rust v. Conrad,* 47 Mich. 449, 455, 11 N. W. 265; *Express Co. v. Railroad Co.* 99 U. S. 191; *Park v. M., St. P. & S. S. M. R. Co.* 114 Wis. 347, 353, 89 N. W. 532; *Peshtigo L. Co. v. Ellis,* 122 Wis. 433, 439, 100 N. W. 834. The contract with *Mrs. White* did not cover the second invention, but superseded the first contract, and without an express contract plaintiff could claim no exclusive right. *Hapgood v. Hewitt,* 119 U. S. 226, 7 Sup. Ct. 193; *Dalzell v. Dueber W. C. Mfg. Co.* 149 U. S. 315, 320, 13 Sup. Ct. 886; *American C. L. Co. v. Wilson,* 198 Mass. 182, 84 N. E. 133; *Johnson F. & E. Co. v. Western F. Co.* 178 Fed. 819; *Agawam Co. v. Jordan,* 7 Wall. 583; *McClurg v. Kingsland,* 1 How. 202; *Pressed Steel C. Co. v. Hansen,* 137 Fed. 403; *Valley I. W. Mfg. Co. v. Goodrick,* 103 Wis. 436, 78 N. W. 1096; *Fuller & J. Mfg. Co. v. Bartlett,* 68 Wis. 73, 31 N. W. 747. Upon the question of estoppel they cited *Gill v. U. S.* 160 U. S. 426, 16 Sup. Ct. 322; *Lane & B. Co. v. Locke,* 150 U. S. 193, 196, 14 Sup. Ct. 78; *Timoney v. Buck,* 84 Fed. 887; *Dickerson v. Colgrove,* 100 U. S. 578, 580; *Swain v. Seamens,* 9 Wall. 254; *McLean v. Dow,* 42 Wis. 610. As to unfair competition they cited Paul, Trade-marks, §§ 209, 210, 215; *Gorham Mfg. Co. v. Emery-Bird-Thayer D. G. Co.* 104 Fed. 243; *Kann v. Diamond S. Co.* 89 Fed. 706; *Morgan E. Co. v. Walton,* 86 Fed. 605; *Burgess v. Burgess,* 3 De G., M. & G. 896; *Rogers & Bro. v. Rogers,* 53 Conn. 121, 155, 1 Atl. 807; *Turtin v. Turtin,* L. R. 42 Ch. Div. 128, 143; *Fish Bros. W. Co. v. La Belle W. Works,* 82 Wis. 546, 52 N. W. 595; *Rowell v. Rowell,* 122 Wis. 1, 99 N. W. 473; *Marshall v. Pinkham,* 52 Wis. 572,

9 N. W. 615; *Dr. A. Reed C. S. Co. v. Frew,* 162 Fed. 887; *Magee F. Co. v. Le Barron,* 127 Mass. 115; *P. Lorillard Co. v. Peper,* 86 Fed. 956, 960.

WINSLOW, C. J.     *Mrs. White* is unquestionably a proper, if not a necessary, party to this action.     A substantial part of the relief sought consists in determining the rights of the plaintiff in the manufacture and sale of a certain machine covered by a patent of which she is, at least, the record owner. A complete settlement of the questions involved in the action could hardly be satisfactorily attained unless she be present as a party.     Sec. 2603, Stats. (1898).

The facts in the case are very largely undisputed.     Upon the disputed propositions we have quite carefully examined the evidence and have found no reason to differ with the conclusions reached by the trial judge, hence the questions to be considered are purely questions of law, and they are four in number, viz.: (1) Was the contract of November, 1896, between the plaintiff and *A. E. White* superseded by the contract of September, 1899, between the plaintiff and *Georgianna M. White?*     (2) Was the machine covered by the second patent an improvement upon the machine covered by the first patent within the meaning of the two contracts?     (3) Has the plaintiff any rights in *White's* third invention?     (4) Should *White* be restrained from using the word "White" as a trademark, or from advertising and selling his third invention under the name "Improved White Swage," or a similar combination of words which include the word "White" as an essential element?

1. The first question must be answered in the affirmative. That the title of the patent was placed in the name of *Mrs. White* without consideration is undisputed.     That this was merely a formal transfer and without intention to make any practical difference in the real ownership or power of control

by *Mr. White* is hardly open to doubt.   All the facts indicate this result.   *Mrs. White* signed the second contract at request of her husband without knowing its contents.   The checks for royalties, though made out in her name, went into the family bank account, against which both drew as they had occasion just as before.   The business was done by *White* just as before.   On both sides the apparent change in ownership was evidently considered merely a change in name but not in legal effect.   We cannot escape the conclusion that the contract of September, 1899, was to all intents and purposes the contract of *Albert E. White* so far as the plaintiff is concerned, and hence that it superseded and took the place of the contract of November, 1896.

2. The second question also must receive an affirmative answer.   The machine covered by the second patent seems unquestionably to be merely an improvement on the first machine; and it was so denominated by *White* himself in the specification of the second patent.   If there were doubt about this, the evidence shows very persuasively that the parties so treated it for four years, and thus removed all question of doubt as to the matter by their own voluntary acts.   *Burton v. Douglass,* 141 Wis. 110, 123 N. W. 631, and cases cited.

3. The trial court held that whatever rights the plaintiff might have rightly claimed in the third invention under the clause of the contract giving it the exclusive right to manufacture and sell the inventions and improvements on the original *White* swage "which are or may be invented or added thereto," it had estopped itself from now claiming any right therein by its conduct in allowing *Mr. White* to proceed and make patterns and models in its own shop at a considerable cash outlay for materials, workmanship, etc., paid by him to the plaintiff, with the full knowledge and understanding of its rights and of the intention of *Mr. White* to use those patterns and models in a shop of his own in manufacturing

swages under the third invention.    Here are all the elements of a complete estoppel, and hence the third question must be answered in the negative.

4. The last question is not so much a question of trademark as of fair or unfair competition in trade.    It is certain that the plaintiff had at great expense and by efforts extending over a number of years established a market and a reputation for the "White Saw Swage."    It had for years used the names "White Saw Swage," "New White Swage," and "Improved White Swage" in its advertising and its catalogues with the express approval of *Mr. White,* indicated over his own signature in the catalogue issued in 1905.    Evidently he was willing and even desirous that the machines manufactured by the plaintiff under the first and second patent should become known to the trade and to the public generally as the "White Swage," the "New White Swage," and the "Improved White Swage."

It is unquestionably true that a man's name is his own property, and he has the right to every honest and fair use of it, just as he has to every honest and fair use of his other property.    There may be cases, however, where he may be enjoined from using his own name in certain ways.    The principle is very clearly stated in the case of *Russia C. Co. v. LePage,* 147 Mass. 206, 17 N. E. 304, as follows:

"Every one has the absolute right to use his own name honestly in his own business for the purpose of advertising it, even though he may thereby incidentally interfere with and injure the business of another having the same name.    In such case the inconvenience or loss to which those having a common right to it are subjected is *damnum absque injuria.* But although he may thus use his name, he cannot resort to any artifice or do any act calculated to mislead the public as to the identity of the business firm or establishment, or of the article produced by them, and thus produce injury to the other beyond that which results from the similarity of name."

*Singer Mfg. Co. v. June Mfg. Co.* 163 U. S. 169, 16 Sup. Ct. 1002; *Herring-Hall-Marvin S. Co. v. Hall's S. Co.* 208 U. S. 554, 28 Sup. Ct. 350.

The name of a person may become so bound up with a particular product that the attaching of the name to a similar and later product would have the effect of a false representation that it was in fact the original product. The idea is thus expressed, with plentiful citation of authorities, in 38 Cyc. 811:

"Where a personal name has become the trade-name for particular goods, another person of the same or a similar name may not use such name as the trade-name for similar goods, or in such a way as to cause his goods to be known and called for in the market by the same name as his rival's goods are already known to, and called for by, the purchasing public."

Such is the case here. The swages manufactured by the plaintiff have become favorably known to the trade and purchasing public by the name of the "White Swage" or the "Improved White Swage." Now, while *Mr. White* may rightfully manufacture and sell his newly invented swage, using his own name, he obviously ought not to be allowed to mislead the public into believing that it is the swage long manufactured by the plaintiff that he is selling.

This we understand to be the true meaning of the judgment on this branch of the case. *Mr. White* may use his own name in his business, either separately or as part of the name of a firm or corporation, and may advertise the fact that he is the inventor of the swage which he is selling. He may also advertise that he makes and sells a saw swage, an improved saw swage, or a new saw swage, for none of these words can be appropriated by any one,—they are public. But he is debarred from advertising or designating his swage by such combinations of words as the "White," or the "White Saw Swage," or the "Improved White Saw Swage," because thereby he is likely to deceive customers, and lead them to suppose that he

is making and selling the product long known to the trade, with *White's* knowledge and consent, under those or very similar names.

It is suggested that the case of *Fish Bros. W. Co. v. La Belle W. Works,* 82 Wis. 546, 52 N. W. 595, holds a somewhat different doctrine. In that case the defendants were permitted to use their own names and even the rebus of a fish, although the plaintiffs had acquired by purchase of their former business the right to use those names and the rebus as a trade-mark. The question arose upon an application for a preliminary injunction, not after trial, and there were no facts showing that actual injury had resulted to the plaintiffs. This court held that the defendants could lawfully apply to the wagons made by them their names and the rebus, provided they did it in a way not calculated to induce persons to buy the same as and for those manufactured by the plaintiffs. It was further said, "their advertisements and marks must truthfully and in good faith refer to their own manufactures, trade, and business, and not to those of the plaintiffs." Thus the case recognized the principle that the names must not be used in a way to deceive the purchasing public. In that case, as before stated, there was no proof of actual deception or injury; but in the present case there is not only proof, but a finding to that effect, and hence we cannot regard anything actually decided in that case as contrary to the principle decided in the present case.

In one respect the judgment is too sweeping and must be modified. It adjudges that the plaintiff has the exclusive right to manufacture and sell the saw swages covered by both the first and second patents during the "life of said patents," and enjoins the defendants from manufacturing or selling the same during such period.

The contract which governs the rights of the parties, namely, the second contract, grants the exclusive right "to the full end of the term of said patent, subject to the conditions

hereinafter named." The patent there referred to, and the only one then existing, was the first patent, issued August 3, 1897, and expiring in 1914, hence the exclusive right must terminate at that time, and the judgment must be so modified. It must be further modified by adding to the adjudication of the exclusive right during the life of the first patent a clause providing that such right is subject to termination under the provisions of the fourth subdivision of the second contract.

With these modifications the judgment must be affirmed on both appeals.

*By the Court.*—It is so ordered. No costs are allowed to either party, except that the fees of the clerk of this court shall be taxed and paid by the defendants.

SIEBECKER, KERWIN, and TIMLIN, JJ., dissent from that part of the decision which affirms the injunction below prohibiting the use by defendant of his name.