**MILLER, Alien Property Custodian, v. AN-
CHOR PACKING CO. et al.**

(District Court, D. New Jersey. February 17,
1925.)

No. 3700.

War ⬅12—Alien Property Custodian may
not maintain suit against licensee for use of
trade-mark; "owner."

Trading with the Enemy Act, § 10 (f),
being Comp. St. 1918, Comp. St. Ann. Supp.
1919, § 3115½ee, authorizes the owner of a
trade-mark under which a license 'has been
granted as provided in the act to bring suit
in equity within one year after the end of the
war against the licensee to recover for the use
of the trade-mark, under the license, notice of
which suit shall be given to the Alien Property
Custodian. *Held*, that such custodian, though
he had seized the trade-mark, is not the "own-
er" within the meaning of such provision, but
merely a conservator, and cannot maintain a
suit thereunder.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Owner.]

In Equity. Suit by Thomas W. Miller,
Alien Property Custodian, against the An-
chor Packing Company and others. Decree
for defendants.

Walter G. Winne, U. S. Atty., of Hacken-
sack, N. J., Harry E. Knight and Herman
J. Galloway, Sp. Asst. Attys. Gen. (Joseph
Henry Cohen, Sp. Asst. Atty. Gen., of coun-
sel), for plaintiff.

Scammell & Besore, of Trenton, N. J.
(Scott Scammell, of Trenton, N. J., and
Frank S. Busser and George J. Harding,
both of Philadelphia, Pa., of counsel), for
defendants Anchor Packing Co.

Manheim & Wachtell, of New York City
(Samuel R. Wachtell, of New York City, of
counsel), for Ungarische Gummiwaarenfa-
brick Actiengesellschaft.

Joseph H. Choate, Jr., of New York City
(James Garretson, of New York City, and
Seiforde M. Stellwagen, of Washington, D.
C., of counsel), for Chemical Foundation,
Inc., as amicus curiæ.

LYNCH, District Judge. This litigation
involves the use of the trade-mark "Tauril"
as applied to certain high-pressure sheet
packing made of asbestos and rubber. Prior
to 1904, the Ungarische Gummiwaarenfabrik
Actiengesellschaft, a corporation of Austria-
Hungary, which we shall hereinafter refer
to as the "Hungarian Company," had estab-
lished the sale of "Tauril" in the United
States of America, and on July 5, 1904, reg-
istered the trade-mark here for a period of
30 years.

On September 24, 1908, the Hungarian
company designated the Anchor Packing
Company of Delaware, the predecessor of
the defendant Anchor Packing Company, as
its exclusive selling agent for "Tauril" in
and for the United States of America and
Mexico. Under this agreement the Hungari-
an company shipped "Tauril" to this coun-
try, which was sold by the Anchor Company
under its exclusive agency. The shipments
were marked, " 'Tauril,' patented in United
Kingdom, France, Italy, Austria-Hungary,
Germany," with numbers of the patents.

In 1911, the present Anchor Packing Com-
pany (defendant) succeeded to the business
of the Anchor Packing Company of Dela-
ware.

The European War of 1914 interrupted
the shipping of this packing from Hungary,
but in February, 1915, the attorney in fact
of the Hungarian company in this country
made an agreement with the defendant An-
chor Packing Company, giving it "permis-
sion to use our trade-mark 'Tauril' on high-
pressure sheet packing until such time as we
are able to supply you with this material in
New York, through the Strobel & Wilken
Company, who will give you thirty (30)
days' notice to discontinue." After fixing
prices, the agreement continued:

"As soon as the Hungarian Rubber Goods
Company, Budapest, will be able to ship
Tauril to the United States again, you will
be properly notified, and you must agree to
accept within thirty (30) days the entire
stock of packing that is being held there for
your account.

"It must be further understood, that all
the American packing, that is stamped 'Tau-
ril,' cannot be sold as imported."

Within one month after war with Ger-
many was declared by Congress (May 11,
1917), a second supplemental agreement
was signed, changing the price from 55 cents
per pound to 54 cents, but leaving the roy-
alty accruing to the Hungarian Company at
6 cents per pound.

On October 6, 1917, the Trading with the
Enemy Act (Comp. St. 1918, Comp. St.
Ann. Supp. 1919, §§ 3115½a–3115½j) was
approved. Those sections which relate to
this cause will be referred to hereinafter.

On October 12, 1917, the President, by ex-
ecutive order, vested the functions assigned
to him by section 10 (c) and 10 (d) of the
Trading with the Enemy Act (section
3115½ee) in the Federal Trade Commis-
sion. The Federal Trade Commission there-
after established rules relating to licenses for
the use of trade-marks.

On December 7, 1917, by Joint Resolution, war was declared on Austria-Hungary. Five days thereafter (December 12, 1917) the defendant Anchor Packing Company applied to the Federal Trade Commission for a license for the exclusive use of the trade-mark "Tauril," which the Hungarian company had registered July 5, 1904. We shall quote some important provisions of this application. After referring to the agreements of September, 1908, February, 1915, and May, 1917, the application continues:

"From the date of the original agreement (September 24, 1908) up to the year 1915, the said packing bearing the trade-mark 'Tauril' was manufactured by the said Hungarian Rubber Goods Factory, Limited, in Budapest, Hungary, and by it exported to the said Strobel & Wilken Company, its only authorized agent resident at New York City, N. Y. Said packing was kept in storage by the Strobel & Wilken Company. The packing was sold by the applicant and its said predecessor under its own name direct to the trade and shipments were made by the Strobel & Wilken Company, in accordance with orders received from the applicant and its said predecessor, to the branch offices of applicant and its said predecessor, from which shipments were in turn made direct to the customers of applicant and its said predecessor. The bills for said packing so sold were rendered to the customers by and in the name of the applicant and its said predecessor and payment was made by the customers direct to the applicant and its said predecessor.

"Since the year 1915 applicant has had manufactured for it, and has sold direct to the trade, under its own name, rubber and asbestos packing under the name 'Tauril.' In accordance with the said first supplemental agreement, after bills for the manufacture of said packing were rendered to applicant by the manufacturer, applicant rendered bills for the same amount to the said the Strobel & Wilken Company, who paid the amount of the same to applicant and who rendered to applicant bills for a larger amount, the difference representing the amount of the agreed royalty or license fee for the exclusive use and enjoyment by applicant of the said trade-mark. Since the date of the second supplemental agreement (May 11, 1917), the said royalty or license fee agreed to and paid by applicant has been at the rate of six cents per pound.

"* * * For a period of over nine consecutive years, packing under the trade-mark 'Tauril' has been sold in this country exclusively by applicant and its said predecessor in business and the trade-mark has been associated by the trade exclusively with applicant and its said predecessor of the same name. In other words, all the incidents of trade-mark ownership, save the actual technical title to the registered trade-mark, are in applicant and have been in applicant for over nine years. * * * It is for the public benefit that this exclusive license be granted, because thereby the public will be assured that in purchasing packing under the name 'Tauril,' it will receive identically the same product that it has heretofore bought under that name. The packing is used for jointing as applied to pipes and other steam joints and is required by manufacturers of all kinds including those making munitions of war. The demand for the article is steady and has not been substantially affected by the war.

"* * * In the event of the grant of this license it is proposed to charge the trade the same price which it is now paying unless the cost of manufacture should substantially increase. The said prices are as follows:

"$1.25 per pound for packing one-sixteenth and one-eighth inch thick.

"$1.50 per pound for packing one-thirty-second inch thick. * * *

"The license desired, being for the use of a trade-mark, is necessarily exclusive, and it is desired for the duration of the registered trade-mark aforesaid. * * * Inasmuch as for nine years applicant has in fact enjoyed the exclusive use of the trade-mark and inasmuch as the owner of the registered trade-mark cannot itself use the same in this country, and inasmuch as some one other than the owner must exclusively use the said trade-mark during the continuance of the war if the said trade-mark rights are not to be abandoned and forfeited to the public, it is submitted that justice and equity require that applicant should be permitted to enjoy that right subject to the payment of the same royalty or license fee that it has heretofore paid by agreement with the owner of the registered trade-mark, namely, six cents per pound. The refusal to license applicant would destroy an important and profitable part of its business and good will which has been built up by years of effort and expense, while the grant of a license to some one other than applicant would vest in another a business and good will which has been created by the effort and expense of applicant. * * *"

On February 19, 1918, the Federal Trade Commission issued a license to the defendant, setting forth the value of the use of

the mark at $1.20 per pound, and the royalty at 6 cents per pound.

On March 28, 1918, an act (chapter 28, 40 Stat. 459) was passed broadening the powers of the Alien Property Custodian to dispose of property under section 12 of the Trading with the Enemy Act (section 3115½ff).

On November 4, 1918, an act was passed (Comp. St. Ann. Supp. 1919, § 3115½d) amending section 7 of the Trading with the Enemy Act and more clearly authorizing the seizure of trade-marks, and also providing that the sole relief for any claimant shall be that provided by the act.

On November 11, 1918, the Armistice was signed.

On July 11, 1919, section 9 of the Trading with the Enemy Act relating to procedure to reclaim by nonenemy owners was amended (Comp. St. Ann. Supp. 1923, § 3115½e).

On June 5, 1920, section 9 of the Trading with the Enemy Act was again amended (Comp. St. Ann. Supp. 1923, § 3115½e).

On August 4, 1920, the Alien Property Custodian seized the trade-mark and business of the enemy and every right, title, and interest with respect thereto, including damages and profits recoverable at law or in equity from any person, firm, corporation, or government, for past infringement thereof.

On July 2, 1921, Congress by Joint Resolution terminated the war.

On May 13, 1922, a new agreement was entered into between the Hungarian company and the Anchor Packing Company, whereby the Hungarian company agreed to manufacture for and sell to the Anchor Packing Company "Tauril" for 50 years, which the Anchor Company agreed to purchase and take on the terms and conditions in such agreement stated. The Anchor Company further agreed to pay the Hungarian company $25,000 in full for royalties earned or accrued under the Federal Trade Commission license. The agreement, among other things, provided that the Anchor Company might stop its sale of "Tauril" on one year's notice, and the rights to manufacture and sell reverting to the Hungarian company.

On May 22, 1922, the Hungarian company released the Anchor Packing Company from all right and claim to and all rights of action in respect of the money paid under the Federal Trade Commission license.

On June 28, 1922, the Hungarian company filed an action under section 10(f) of the Trading with the Enemy Act against the Anchor Packing Company in the Eastern district of Pennsylvania.

On July 1, 1922, the present action was started.

July 2, 1922, was the end of the period of bringing an action under section 10(f) of the Trading with the Enemy Act.

On August 20, 1923, another agreement was entered into between the Hungarian company and the Anchor Packing Company, permitting the manufacture or purchase here or in Mexico of "Tauril," subject to the Anchor Packing Company paying 5 cents per pound and manufacturing or purchasing a specified amount; the Hungarian company agreeing to furnish expert and written formulæ, and the Anchor Company agreeing to keep the secret.

The right of the plaintiff to recover in this litigation is opposed by the Anchor Company, which asserts that it, a citizen of the United States and not an enemy, was the actual owner of the trade-mark at the time of the seizure as well as at the time this suit was brought, and that therefore the plaintiff has no right to maintain this action.

On the other hand, the enemy, the Hungarian company, which has asked and secured permission to intervene, asserts that it was and is the owner of the trade-mark, and that it, and not the Alien Property Custodian, has the right to bring suit.

The Chemical Foundation, Inc., has filed a brief amicus curiæ. It has purchased from the Alien Property Custodian patents and trade-marks under which licenses previously had been issued by the Federal Trade Commission in accordance with that section of the act which is under consideration here, and naturally that company is vitally interested in the question here involved.

Pertinent parts of the Trading with the Enemy Act are as follows:

"Section 7 (e), before it was amended on November 4, 1918, provided: 'If the President shall so require, any money or other property owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the alien property custodian.' (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d).

"Section 10 (c), (d), (e), and (f) provided:

" '(c) Any citizen of the United States or any corporation organized within the United States desiring * * * to carry on, or to use any trade-mark, * * * owned or controlled by an enemy or ally of enemy at any time during the existence of a state of war may apply to the President for a license; and the President is hereby authorized to grant such a license, nonexclusive or exclusive as he shall deem best, provided he shall be of the opinion that such grant is for the public welfare, and that the applicant is able and intends in good faith * * * to use the trade-mark. * * * The President may prescribe the conditions of this license, including the fixing of prices of articles and products necessary to the health of the military and naval forces of the United States or the successful prosecution of the war, and the rules and regulations under which such license may be granted and the fee which shall be charged therefor, not exceeding $100, and not exceeding one per centum of the fund deposited as hereinafter provided. Such license shall be a complete defense to any suit at law or in equity instituted by the enemy or ally of enemy owners of the * * * trade-mark * * * or otherwise, against the licensee for infringement or for damages, royalty, or other money award on account of anything done by the licensee under such license, except as provided in subsection (f) hereof.

" '(d) The licensee shall file with the President a full statement of the extent of the use and enjoyment of the license, and of the prices received in such form and at such stated periods (at least annually) as the President may prescribe; and the licensee shall pay at such times as may be required to the alien property custodian not to exceed five per centum of the gross sums received by the licensee from the. * * * use of the trade-mark, * * * or, if the President shall so order, five per centum of the value of the use of such * * * trade-marks, * * * to the licensee as established by the President; and sums so paid shall be deposited by said alien property custodian forthwith in the Treasury of the United States as a trust fund for the said licensee and for the owner of the said * * * trade-mark * * * as hereinafter provided, to be paid from the treasury upon order of the court, as provided in subdivision (f) of this section, or upon the direction of the alien property custodian.

" '(e) Unless surrendered or terminated as provided in this act, any license granted hereunder shall continue during the term fixed in the license or in the absence of any such limitation during the term of the * * * trade-mark * * * registration under which it is granted. Upon violation by the licensee of any of the provisions of this act, or of the conditions of the license, the President may, after due notice and hearing, cancel any license granted by him.

" '(f) The owner of any * * * trade-mark * * * under which a license is granted hereunder may, after the end of the war and until the expiration of one year thereafter, file a bill in equity against the licensee in the District Court of the United States for the district in which the said licensee resides, or, if a corporation, in which it has its principal place of business (to which suit the Treasurer of the United States shall be made a party), for recovery from the said licensee for all use and enjoyment of the said * * * trade-mark. * * * Provided, however, that whenever suit is brought, as above, notice shall be filed with the alien property custodian within thirty days after date of entry of suit. Provided further, that the licensee may make any and all defenses which would be available were no license granted. The court on due proceedings had may adjudge and decree to the said owner payment of a reasonable royalty. The amount of said judgment and decree, when final, shall be paid on order of the court to the owner of the patent from the fund deposited by the licensee, so far as such deposit will satisfy said judgment and decree; and the said payment shall be in full or partial satisfaction of said judgment and decree, as the facts may appear; and if, after payment of all such judgments and decrees, there shall remain any balance of said deposit, such balance shall be repaid to the licensee on order of the alien property custodian. If no suit is brought within one year after the end of the war, or no notice is filed as above required, then the licensee shall not be liable to make any further deposits, and all funds deposited by him shall be repaid to him on order of the alien property custodian. Upon entry of suit and notice filed as above required, or upon repayment of funds as above provided, the liability of the licensee to make further reports to the President shall cease.

" 'If suit is brought as above provided, the court may, at any time, terminate the license, and may, in such event, issue an injunction to restrain the licensee from infringement thereafter, or the court, in case the licensee, prior to suit, shall have made investment of capital based on possession of the license,

may continue the license for such period and upon such terms and with such royalties as it shall find to be just and reasonable.' Section 3115½ee.

"Section 12 provided:

" ' < * * The Alien Property Custodian shall be vested with all the powers of a common-law trustee in respect of all property, other than money, which shall come into his possession in pursuance of the provisions of this act, and, acting under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe, may manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights which may be or become appurtenant thereto or to the ownership thereof, if and when necessary to prevent waste and protect such property and to the end that the interests of the United States in such property and rights or of such person as may ultimately become entitled thereto, or to the proceeds thereof, may be preserved and safeguarded. * * *

" 'After the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the Alien Property Custodian or deposited in the United States treasury, shall be settled as Congress shall direct. * * * And provided further, that the Treasurer of the United States, on order of the alien property custodian, shall, as provided in section ten hereof, repay to the licensee any funds deposited by said licensee.' " Section 3115½ff.

On August 4, 1920, 2½ years after the Federal Trade Commission licensed the Anchor Company to use "Tauril," the Alien Property Custodian seized the trade-mark and business of the enemy and every right, title, and interest with respect thereto, including damages and profits recoverable for the past infringement thereof.

Assuming that the Custodian had the right to seize the trade-mark and business of the enemy and every right, title, and interest with respect thereto, this court cannot agree that the Custodian had any right or authority to seize any action at law for or on account of damages recoverable for past infringement. This right of action, it seems, was specifically reserved to the owner by section 10(f). So the Custodian, in order to maintain an action under section 10(f), on which he expressly relies in this cause, must demonstrate that he is the owner of the trademark within the meaning of that section. An

analysis of the section shows that the remedy is given to "the owner of any * * * trade-mark * * * under which a license is granted."

There is no doubt that a license of the trade-mark "Tauril" was granted. Who was the owner of it? The legal title was in the enemy Hungarian company. True, the Alien Property Custodian seized it. But he is nothing more than his title implies—a custodian or trustee to hold money or property of an enemy and settle it as Congress shall direct. See Swiss National Insurance Co. v. Miller '(No. 132) 267 U. S. 42, 45 S. Ct. 213, 69 L., Ed. ——.

If the Custodian were to be regarded as the owner, there would be no sense in providing for an equity suit "after the end of the war and until the expiration of one year thereafter."

Further, the law required notice of such suit to be "filed with the Alien Property Custodian within thirty days after the entry of suit." This clause in itself, it seems to us, is a complete answer to any idea or thought that Congress intended that the right of action could be in the Alien Property Custodian as owner. What imaginable reason could there be for his bringing a suit and then notifying himself within 30 days that he had brought it?

That the Alien Property Custodian was not considered as a possible plaintiff is evident, it seems to us, from a reading of other provisions of section 10 (f). It provides that the owner must sue within one year after the war. If he does not sue, then the Custodian must order the Treasurer to refund to the licensee the money deposited by him. Some means were necessary of informing the Custodian whether suit had been brought. Accordingly, the statute makes it mandatory that notice be given the Custodian. It does not stop there, however, but insures such notice by giving to a failure to give notice the same effect as a failure to bring suit. It says: "If no suit is brought within one year after the end of the war, or no notice is filed as above required, then the licensee shall not be liable to make any further deposits, and all funds deposited by him shall be repaid to him on order of the Alien Property Custodian."

We have very carefully considered this section 10 (f), as well as the various arguments advanced concerning it, and find ourselves unable to escape the conclusion that Congress never intended that the Custodian should bring the action provided for therein. The Custodian, for the purposes of con-

servation of seized property, had very wide powers, but only powers necessary to preserve his position of custodian or trustee. The right of action specifically provided for, it seems to us, was intended for the use of the actual owner only, and not the custodian or trustee as in this case.

A decree in accordance herewith will be entered.