HICKS, Alien Property Custodian, v. ANCHOR PACKING CO. et al.

(Circuit Court of Appeals, Third Circuit. December 21, 1926.)

No. 3407.

1. War ⊜⟞12—Licensee of enemy-owned trademark was not owner, acquired no rights licensor could not grant, and could not challenge licensor's power (Trading with the Enemy Act, §§ 5[a], 10[c], being Comp. St. §§ 3115½c, 3115½ee).

Where Federal Trade Commission granted license to use enemy-owned trade-mark, under Trading with the Enemy Act §§ 5 (a), 10 (c), being Comp. St. §§ 3115½c, 3115½ee, without seizing property or acquiring title, licensee did not become owner of trade-mark, but only acquired right to use it for limited time on stated royalty, and could not challenge licensor's power, nor claim that it received more than licensor had power to give.

2. War ⊜⟞12—Licensee of enemy-owned trade-mark, uniformly recognizing foreign owner's title, could not claim ownership as appurtenant to its business. (Trading with the Enemy Act, §§ 5 [a], 7 [c], 10 [c], being Comp. St. §§ 3115½c, 3115½d, 3115½ee).

Where licensee of foreign-owned trade-mark uniformly recognized foreign owner's ownership and paid royalties for its use, and in application to Federal Trade Commission for license to use such enemy-owned trade-mark under Trading with the Enemy Act §§ 5 (a), 10 (c), being Comp. St. §§ 3115½c, 3115½ee, conceded such ownership, *held*, that licensee could not claim ownership as appurtenant to its business when license was granted and when Alien Property Custodian seized it under section 7 (c), being Comp. St. § 3115½d.

3. Trade-marks and trade-names and unfair competition ⊜⟞39—Exclusive license to use trade-mark limited as to duration and place does not give title to licensee.

Grant of exclusive use of trade-mark, limited as to duration and place, does not convey title or establish ownership of trade-mark in licensee or in purchaser of trade-mark goods for resale.

4. War ⊜⟞12—Enemy owner of trade-mark seized by Alien Property Custodian held not "owner," entitled to sue for its use (Trading with Enemy Act, §§ 5 [a], 10 [c], [f], being Comp. St. §§ 3115½c, 3115½ee, and section 7 [c], as amended by Act Nov. 4, 1918 [Comp. St. § 3115½d]).

Where Alien Property Custodian seized enemy-owned trade-mark, under Trading with the Enemy Act, § 7 (c), as amended by Act Nov. 4, 1918 (Comp. St. § 3115½d), subject to license to use previously granted by Federal Trade Commission under sections 5 (a), 10 (c), being Comp. St. §§ 3115½c, 3115½ee, enemy owner was not "owner" of trade-mark, within section 10 (f), entitled to sue for use thereof.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Owner.]

5. War ⬡➞12—Alien Property Custodian held "owner" of trade-mark seized by him, entitled to recover for its use (Trading with the Enemy Act, §§ 5 [a], 10 [c], [f], being Comp. St. §§ 3115½c, 3115½ee; section 12, as amended by Act March 28, 1918, and section 7 [c], as amended by Act Nov. 4, 1918 [Comp. St. §§ 3115½ff, 3115½d]).

Under Trading with the Enemy Act, §§ 5 (a), 10 (c), being Comp. St. §§ 3115½c, 3115½ee, section 12 amended by Act March 28, 1918, and section 7 (c) as amended by Act Nov. 4, 1918 (Comp. St. §§ 3115½ff, 3115½d), where trade-mark was seized by Alien Property Custodian, subject to license to use previously granted by Federal Trade Commission, *held*, that Custodian became "owner" thereof, with section 10 (f), and was entitled to recover for its use.

Appeal from the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

Suit by Frederick C. Hicks, as Alien Property Custodian, against the Anchor Packing Company and another, in which the Ungarische Gummiwaarenfabrik Actiengesellschaft intervened. Bill dismissed, and plaintiff appeals. Reversed with directions.

Herman J. Galloway, Asst. Atty. Gen., Walter G. Winne, U. S. Atty., of Hackensack, N. J., and Harry E. Knight and Joseph Henry Cohen, Sp. Asst. Attys. Gen., for appellant.

George J. Harding and Frank S. Busser, both of Philadelphia, Pa., and Scott Scammell, of Trenton, N. J., for appellee Anchor Packing Co.

Samuel R. Wachtell, of New York City, for appellee Hungarian Rubber Factory.

James Garretson, of New York City, Seiforde M. Stellwagen, of Washington, D. C., and Joseph H. Choate, Jr., of New York City, amici curiæ.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This suit was instituted by the Alien Property Custodian against the Anchor Packing Company, a New Jersey corporation, to recover for the use of the trade-mark "Tauril," registered here by the Ungarische Gummiwaarenfabrik Actiengesellschaft, a corporation of Austria-Hungary, in connection with the sale of patented high pressure packing, for whose use in the United States first the Hungarian Company and later the Federal Trade Commission, under authority of the Trading with the Enemy Act (40 Stat. 411 [Comp. St. §§ 3115½a–3115½j]), gave the Anchor Company exclusive licenses for limited periods.

The Custodian, acting under the amendment to subsection (c) of section 7 of the Trading with the Enemy Act, approved November 4, 1918 (40 Stat. 1020 [Comp. St. § 3115½d]), which authorized the seizure of enemy-owned trade-marks, seized the trade-mark in question as enemy-owned and, thereafter regarding himself the "owner," brought this action under section 10 (f), of the Act, being Comp. St. § 3115½ee, which provides that:

"The *owner* of any * * * trade-mark * * * under which a license is granted hereunder may, after the end of the war and until the expiration of one year thereafter, file a bill in equity against the licensee * * * for recovery from the said licensee for all use and enjoyment of the said * * * trade-mark. * * *"

At the trial the Anchor Company first denied that the trade-mark was owned by an enemy, next claimed ownership in itself, and finally contended that, whoever may own it, the Custodian, even though the seizure were lawful, is not the "owner" within the sense of section 10 (f) and is without right to recover thereunder. The Hungarian Company, concededly the original owner and an enemy during the war, having been granted leave to intervene, claimed that it, as against both the Anchor Company and the Custodian, is the owner of the trade-mark and that it alone has a right to maintain an action under the cited section of the Act.

Thus were raised three distinct issues of ownership. We shall refer to the facts out of which they grew when we come to the discussion.

The learned trial court, while it did not expressly find that the Anchor Company is not the owner of the trade-mark, made such a finding by necessary inference from its finding that the legal title is in the Hungarian Company. It rested its decision of the case, however, not so much on the ownership of one or the other of these corporations as on the lack of ownership in the Custodian, the plaintiff. Not having the advantage of authoritative decisions subsequently rendered, the learned trial court construed the Trading with the Enemy Act in the light of its original enactment, namely, as a purely conservation measure under which the Custodian was a mere trustee of enemy seized property to be recovered by the enemy owner after the war, and failed to note the force of the amendments to the Act made from time to time as the war progressed. Under this construction the trial court, regarding the enemy owner as the "owner" intended by section 10 (f) of the Act with the right after the war to sue

for the use and enjoyment of its trade-mark which had been licensed by the Federal Trade Commission and holding that the Custodian had not, even by valid seizure, become the "owner," dismissed the bill.

The Alien Property Custodian alone appealed. It would seem that the only issue on appeal is his ownership of the trade-mark and, accordingly, his right to maintain this action under the quoted section of the Act. Having prevailed on the main issue of non-ownership in the Custodian and being without practical reason for attacking the decision, the defendant and intervening corporations very naturally did not appeal. Yet the decree is here. We shall, therefore, review it as rendered on the three issues raised and tried.

### The Anchor Packing Company.

The issue of the Anchor Company's ownership of the trade-mark "Tauril" is one of fact considered in respect to familiar trade-mark law as affected by the war Act in question

The Hungarian Company long ago established a business in this country for the sale of its foreign-made wares under its trade-mark "Tauril." In 1904 it registered the mark in the United States Patent Office. In 1908 the Hungarian Company, reserving to itself the exclusive right of manufacture everywhere, appointed the Anchor Packing Company, a Delaware corporation, the defendant's predecessor, its "exclusive selling agents" in the United States for a product bearing the named trade-mark, goods to be shipped to, delivered by, and payments to be made through the Strobel & Wilken Company of New York, the American business representative of the Hungarian Company.

In 1911, the defendant, the New Jersey corporation, succeeded the Delaware corporation of the same name. Business continued as before. When the war interrupted shipments, the Hungarian Company, in 1915, licensed the Anchor Company to use its trade-mark on American-made packing at a royalty of seven cents per pound until shipments might be resumed. In May, 1917, shortly after the United States declared war with Germany, the parties entered into a supplemental agreement fixing the royalty at six cents per pound. On October 6, 1917, the Trading with the Enemy Act was approved. 40 Stat. 411. Among other things that Act permitted any citizen of the United States to apply for the use of an enemy-owned trade-mark (section 10 [c]) and authorized the President, or an officer acting under his direction (section 5 [a], being Comp. St. §

3115½c), to grant a license for its use on such terms as he should decide. On October 12, 1917, the President by executive order vested this power in the Federal Trade Commission, to be exercised "only under exceptional circumstances." On December 7, 1917, war was declared with Austria-Hungary (40 Stat. 429). Two days later the Anchor Company filed with the Federal Trade Commission an application for a license for the exclusive use of the trade-mark "Tauril," showing as a persuasive circumstance the fact that it and its predecessor had, since 1908, used the trade-mark in this country. The license was granted—and accepted—on a six cents per pound royalty.

On August 4, 1920, the Custodian, under authority of the amendment of November 4, 1918 (40 Stat. 1020), seized the trade-mark subject to the license issued by the Federal Trade Commission.

On July 2, 1921, Congress declared the war between the United States and Austria-Hungary at an end. The seas then being open, the Hungarian Company and the Anchor Company, on May 13, 1922, entered into a new sales agreement including a license to the Anchor Company for the exclusive use of the trade-mark in connection with the sale in the United States of its foreign-made packing. By this contract the Anchor Company agreed to pay the Hungarian Company $25,000 in full for all royalties earned and accrued under the Federal Trade Commission license. On June 28, 1922, the Hungarian Company brought suit in a District Court against the Anchor Company under section 10(f) of the Act to recover for the use of its trade-mark under the license granted by the Federal Trade Commission; and on July 1, 1922, the Alien Property Custodian brought this action under the same provision to recover for the same use.

[1] The Anchor Company bases its claim to ownership of the trade-mark "Tauril" primarily on the familiar law that a trade-mark cannot exist, or, if property, it is not the subject of ownership except in connection with an existing business. Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 413, 414, 36 S. Ct. 357, 360, 60 L. Ed. 713; Rosenberg Bros. v. Elliott (C. C. A.) 7 F.(2d) 962; Beech-Nut Packing Co. v. Lorillard (C. C. A.) 7 F. (2d) 967; and on the assertion that neither the Hungarian Company nor the Federal Trade Commission, licensors at different periods, had a business in the United States in connection with which to use the trade-mark, but that it alone was engaged in such a business. From this law the Anchor Company

deduces two claims of ownership; the first, "assuming that the trade-mark was owned by the Hungarian Company, an enemy, at the time of license, the grant to the (Anchor Company) by the Federal Trade Commission of the exclusive right to use the trade-mark made the [Anchor Company] the owner of the trade-mark subject to the obligations of the license."

The license of the trade-mark by the Federal Trade Commission before seizure was a war act exercised under a war law in respect to a privilege which this country had in time of peace bestowed upon one who later became an enemy. War, and war legislation, superseded certain phases of the ordinary law of trade-marks and substituted the sovereign in their place. So, in granting a license for an enemy-owned trade-mark the Federal Trade Commission, acting for the United States, exercised the dominion of the sovereign over enemy property; and it did it without seizing the property and without acquiring title. Not having title of its own, the Federal Trade Commission could convey none to the Anchor Company through license or otherwise. It granted the Anchor Company only the right of use which theretofore belonged to the enemy owner and then for a limited time on a stated royalty. This the Anchor Company accepted, and as licensee it is not in position to challenge the power of its licensor; nor can it validly claim more than the licensor gave it or more than the licensor had power to give. The business of the Anchor Company, however appurtenant to the trade-mark before the war, did not during the war draw the trade-mark to it and thereby divest the enemy owner of its title or limit the war power of the United States either to license or seize it.

[2] Still relying on the possession of an appurtenant business, the Anchor Company's other contention is that it "was the owner of the trade-mark at the time the license to use it was granted by the Federal Trade Commission * * * in 1918, and at the time the Alien Property Custodian attempted to seize it in 1920, and at the date of suit."

The answer to this claim of ownership is found in the agreements between the two companies. In these agreements the Anchor Company uniformly recognized ownership of the trade-mark in the Hungarian Company and agreed to pay, and did pay, royalties for its use in connection, first and last, with the foreign-made product and during the interval of the war with the American-made product. In addition to its concessions of the Hungarian Company's ownership made without qualifications in the several contracts referred to, the Anchor Company, in its application to the Federal Trade Commission for a license to use the trade-mark, in terms conceded that the legal title was in the Hungarian Company. Moreover, the Anchor Company at no time asserted its ownership by availing itself of the provision of the Act whereby a person not an enemy could reclaim his property mistakenly seized.

[3] A grant of an exclusive use of a trade-mark, limited as to duration and place, whether made in contracts for sale of its associated wares or by specific license, does not convey title or establish ownership of the trade-mark in the licensee or in one who purchases marked goods for resale. By such contracts or licenses the Anchor Company acquired only a right to a limited use of the trade-mark. Until seized, the reversionary interest in that use remained in the owner, and so did the title. Here again the Anchor Company, being in substance a licensee under certain contracts and in terms a licensee under other contracts with the Hungarian Company, is not in position to challenge, much less to claim, the title of its licensor. We therefore hold on the facts and the law that the Anchor Company was at no time the "owner" of the trade-mark.

### The Hungarian Company.

[4] There are three facts which bear on the Hungarian Company's claim of ownership of the trade-mark. Thereafter the question is one of law. These are: (1) Ownership by the Hungarian Company when an enemy; (2) license for the use of the trade-mark by the Federal Trade Commission before seizure; (3) its seizure by the Alien Property Custodian subject to the license. In a situation embracing, mutatis mutandis, the first and last facts, the Supreme Court has rendered a decision which in our judgment rules the instant question. That was in United States v. Chemical Foundation, 47 S. Ct. 1, 71 L. Ed. ——, affirming this court, 5 F.(2d) 191, which in turn affirmed the District Court, 294 F. 300. That case concerned the validity of sales of enemy-owned patents and trade-marks made by the Custodian after seizure. Paraphrasing its language somewhat, the Supreme Court said: The former enemy owners have no claim against the trade-marks or the proceeds derived from the sales. The provision of the Act that after the war enemy claims shall be settled as Congress shall direct conferred no rights upon such owners. Moreover, the Treaty of Budapest and the Treaty of Trianon prevent the

enforcement of any claim by Austria-Hungary or its nationals against the United States or its nationals on account of the seizures and sales in question.

From this it is clear that the Hungarian Company, when the Custodian seized its trade-mark, parted with its ownership and also with its claim to the proceeds of the license for its use. We hold that at the time this suit was brought the Hungarian Company was not the "owner" within the meaning of section 10 (f) of the Act.

### Alien Property Custodian.

[5] The issue of the Custodian's ownership of the trade-mark is one of law. It arises from the construction to be given the Trading with the Enemy Act and is based on two official acts authorized by the statute: One, the license of the trade-mark; and the other, its seizure. Sections 5(a) and 10(c), 40 Stat. 411; section 12 as amended by the Act of March 28, 1918, 40 Stat. 459, and subsection (c) of section 7 as amended by the Act of November 4, 1918, 40 Stat. 1020.

The amendment to subsection (c) of section 7 of the Act approved November 4, 1918, authorized the Custodian to seize enemy-owned "patents, copyrights * * * trade-marks, choses in action, and rights and claims of every character and description owing or belonging to * * * an enemy. * * * " On August 4, 1920, the Custodian, determining that the Hungarian Company was an enemy, seized the trade-mark "Tauril," together with "the business of said enemy appurtenant thereto, and every right, title and interest with respect thereto," and demanded, under the terms of the Act, that the trade-mark, together with the rights enumerated, subject to the rights of the Anchor Packing Company, as licensee of the Federal Trade Commission, be transferred, assigned and delivered to him, to be held and administered as provided by law. This demand—a symbolic act of capture—was addressed to the Commissioner of Patents and the Anchor Packing Company, the defendant. The quoted provision of the statute is broad enough to warrant the demand thus made and the demand was broad enough to embrace the license and accrued royalties.

When the Custodian, by seizure, acquired the trade-mark and its legal appurtenances, did he gain an ownership in them that entitled him to the statutory rights and remedies of an owner? In the Chemical Foundation Case we said: "Upon the seizure of enemy property under authority of the Act the title of the enemy owners passed out of them. Passing out of them, it went somewhere." We did not have occasion to determine where it went, whether to the Custodian or the United States. And so the Supreme Court in the same case expressly held that on seizure the enemy owner lost all rights in his property, and, in sustaining sales of enemy-owned patents and trade-marks which the Custodian had seized, it would seem that, by necessary implication, the Supreme Court decided that the Alien Property Custodian had at least the legal title to them. As the Custodian was held in that case to be the owner of such property for purposes of sale, we think he is the owner of the profits arising from the licensed use of the trade-mark for purposes of their recovery by suit. Section 10 (f) provides an owner with such a remedy.

At the institution of this suit, section 10 (f) remained as enacted. It is clear that, when enacted, the Congress did not have the Alien Property Custodian in mind, for the reason that under the original terms of the Act he could not seize and therefore could not own a trade-mark. But later the Congress by amendments changed the whole character of the Act and gave the Custodian power to seize and sell trade-marks. United States v. Chemical Foundation, supra. Legislation when enacted is not always restricted to the then present conditions; it is generally phrased to cover unknown conditions as later they may arise within the general scope of the legislative intent. A new owner appeared in the statute when the Congress created him by the amendments of March 28, 1918, and November 4, 1918, authorizing the Custodian to seize and sell enemy-owned trade-marks with their incidents, which without doubt include profits from a licensed use.

It would, we think, be wrong to hold that the Congress, when it created the Custodian an owner of seized enemy property for certain purposes, at the same time withheld from him the remedies which the statute affords an owner of such property. But for section 10 (f) of the Act there is not available to the Custodian any remedy by which he can assert his rights of ownership in respect to a licensed use of a trade-mark or by which he can recover for their invasion. When the Congress created this quality of ownership in him it became necessary to infer that it intended to give him all the attributes of ownership defined by the Act and, finding provision already made for recovery of a licensed use by the owner of a trade-mark, it may be assumed that the Congress regarded that provision sufficient to cover the case of the Custodian.

A liberal construction of this section has been deemed necessary to effect the purposes of the Congress and to give a remedy where later the Congress by amendment conferred a new right in respect to an old subject. Miller v. Robertson, 266 U. S. 243, 45 S. Ct. 73, 69 L. Ed. 265; Reising v. Deutsche, etc. (C. C. A.) 15 F.(2d) 259. With this in mind, it is evident the Congress did not limit section 10 (f) to the only owner contemplated by the statute at the time of its enactment. When clothed by amendment with the characteristics of an "owner" of the trade-mark, we think the Custodian came within that general term as it appeared in that section, not when enacted but at the time of the commencement of suit, Reising v. Deutsche, etc., supra, and as the profits from the licensed use of the trade-mark belong to the Custodian alone, he has the right of owner to sue for them.

The decree of the District Court is reversed with direction that the bill be reinstated and the case be tried and decided in conformity with this opinion.