**SUTHERLAND, Alien Property Custodian, v. ANCHOR PACKING CO. et al.**

District Court, D. New Jersey. July 6, 1928.

War ⊜12—Hungarian corporation held not entitled to substitution as plaintiff in Alien Property Custodian's suit to recover royalties for corporation's trade-mark (Settlement of War Claims Act 1928, §§ 7, 13, 15, 19, amending Trading with the Enemy Act, §§ 9 (j), (k), 10 (d), (f); 50 USCA Appendix §§ 9, 10, 26–31).

In suit by Alien Property Custodian to recover royalty for use of trade-mark registered by Hungarian corporation, the foreign corporation joined as defendant was not entitled to be substituted as party plaintiff under Settlement of War Claims Act 1928, §§ 13, 15, 19, amending Trading with the Enemy Act, §§ 9 (j), (k), 10 (f), 50 USCA Appendix, §§ 9, 10, 26–31, where suit was brought by Alien Property Custodian within time limited by Trading with the Enemy Act, §§ 10 (d), (f), 50 USCA Appendix, § 10 (d), (f), and settlement had been made and substitution was sought to enable the corporation to discontinue the suit and where no certificate of Secretary of the Treasury was furnished, showing awards of Claims Commission have been satisfied, as required by Settlement of War Claims Act 1928, § 7, before payment of money to Hungarian nationals.

In Equity. Suit by Howard Sutherland, as Alien Property Custodian, against the Anchor Packing Company and the Ungarische Gummiwaarenfabrik Actiengesellschaft. On petition of the last-named defendant to be substituted as plaintiff. Petition denied.

James W. McCarthy, U. S. Atty., of Jersey City, N. J., and Thomas E. Rhodes, Sp. Asst. Atty. Gen., for plaintiff.

Wachtell, Manheim & Grouf, of New York City (Samuel R. Wachtell, of New York City, of counsel), for petitioner.

RELLSTAB, District Judge. The Alien Property Custodian instituted this suit against the Anchor Packing Company, a New Jersey corporation, to recover a reasonable royalty for its use and enjoyment of the trade-mark "Tauril," which it was authorized to use and enjoy under a license issued to it by the Federal Trade Commission, in connection with the sale of an article used for engine packing and jointing, upon the payment of a specified royalty. Previous to the World War the Ungarische Gummiwaarenfabrik Actiengesellschaft (Hungarian Rubber Goods

Factory, Limited), a corporation of Austria-Hungary, manufactured and sold a packing under the same trade-mark, and in 1904 it caused this word "Tauril" to be registered in the United States as its trade-mark for the packing sold under that name. In 1915 the Anchor Company, which for several years had been the exclusive sales agent of the Hungarian Company, was licensed by the latter to use this trade-mark on American-made packing.

On December 7, 1917, the United States declared war against Austria-Hungary. Subsequently the Anchor Company obtained the referred-to license from the Federal Trade Commission, and it paid the royalties therein specified until some time in 1922. These royalties, under section 10 (d) of the Trading with the Enemy Act, were required to be deposited "in the treasury of the United States as a trust fund for the said licensee and for the owner of the said * * * trade-mark, * * * as hereinafter provided, to be paid from the treasury upon order of the court, as provided in subdivision (f) of this section, or upon the direction of the Alien Property Custodian." 50 USCA Appendix, § 10 (d).

On August 4, 1920, the Custodian, under authority of the amending Act of November 4, 1918 (50 USCA Appendix, § 7), seized this trade-mark, subject to the license last mentioned. On July 2, 1921, war between the United States and Austria-Hungary was declared at an end. On July 1, 1922 (within the period limited by section 10 (f) of the Trading with the Enemy Act [50 USCA Appendix, § 10 (f)]), the Custodian, claiming to be the owner of this trade-mark, brought the present suit. Thereafter the Hungarian Company, on its application, was admitted as a party defendant in the suit. In its answer it averred, inter alia, that it, and not the Custodian, was the owner of the trade-mark, and that it alone could bring the action to recover the reasonable royalty demanded, and prayed that the bill be dismissed. This prayer was granted. Miller v. Anchor Packing Co. (D. C. N. J.) 4 F.(2d) 595. On appeal this dismissal was reversed and the suit reinstated. Hicks v. Anchor Packing Co. (C. C. A. 3) 16 F.(2d) 723. Reference to these opinions is made for a more detailed recital of the provisions of the Trading with the Enemy Act involved at the time of the decisions.

The Hungarian Company now petitions to be substituted as plaintiff, and bases its right thereto on the subsequent legislation, cited as the "Settlement of War Claims Act of 1928," approved March 10, 1928 (c. 167,

45 Stat.). In my opinion, this enactment furnishes no basis for granting the substitution applied for, but points to the contrary. The sections relied upon will be presently stated and considered.

Section 10 (f) of the original Trading with the Enemy Act authorized only the owner of a trade-mark to bring an action for recovery from the licensee for the use of the trade-mark. This act did not authorize the seizure of enemy-owned trade-marks, and its provisions are inconsistent with the idea that the Custodian, or any one but the enemy owner, was authorized to bring suit. However, by the Act of November 4, 1918, which authorized the seizure of enemy-owned trade-marks, he perforce was the owner of all seized enemy-owned property, and was authorized to bring suits of the character of the present one. Hicks v. Anchor Packing Co. (C. C. A. 3) 16 F.(2d) 723, supra.

The sections of the Settlement of War Claims Act which are specifically mentioned and relied upon by the petitioner are 13, 15, and 19 (50 USCA Appendix, §§ 9, 10, 26–31). Section 13 amends section 9 (j) and (k) of the Trading with the Enemy Act (50 USCA Appendix, § 9 (j), (k). So far as pertinent, the Custodian is directed to return to the person entitled, whether or not an enemy, any licensed trade-mark seized by him, subject to the license, and any contract, lien, or incumbrance affecting it. Here there is a plain legislative direction to return licensed trade-marks, and, if the act contained no further reference to the return thus authorized and directed, it would be difficult to hold that this provision was not mandatory. However, there are other provisions bearing on this direction. These are found in section 7 of the act, presently to be considered.

Section 15, in the particulars relied upon, authorizes the Custodian, after demand made for money or property of an enemy, and where the whole or part of it, if paid or conveyed to him, would be returnable under the provisions of this act, to waive his demand or accept a less amount than demanded. 50 USCA Appendix, § 29 (a). This vests a discretion in the Custodian alone, and in no way enlarges the rights of the owner of the money or property at the time of seizure.

Section 19 adds a new paragraph to the amended section 10 (f), which, so far as pertinent, provides that in case of the seizure of a trade-mark by the Alien Property Custodian, any suit brought under subsection (f), "within the time limited therein, shall be considered as having been brought by the owner within the meaning of this subsection, in so

far as such suit relates to royalties for the period prior to the sale by the Alien Property Custodian of such * · * * trade-mark, * * * if brought either by the Alien Property Custodian or by the person who was the owner thereof immediately prior to the date such * * * trade-mark * * * was seized or otherwise acquired by the Alien Property Custodian."

This new paragraph recognizes the right of the Custodian to bring the suit authorized by section 10 (f). Its declaration that the suit shall be considered as brought by the owner is limited to those suits that relate to royalties for the period prior to a Custodian's sale of the trade-mark, and is inapplicable to the question now considered, as there was no sale of the trade-mark involved in this suit, and it fails to sustain the contention that it is a legislative direction for the Custodian to eliminate himself from the present litigation.

Section 7, referred to, provides, in substance, that no money or property shall be returned to Hungarian nationals prior to the Secretary of the Treasury certifying that a sufficient amount has been deposited in the Hungarian special deposit account to pay the awards of the Commissioner of the Tripartite Claims Commission between the United States, Austria, and Hungary. As it is conceded that the certificate referred to has not been given, and that the Hungarian government has not made the required deposit, no money or property involved in the present suit can be turned over at this time to the Hungarian Company.

In this situation, why should the Hungarian Company, made a defendant on its own application, now be substituted as plaintiff? True, it could have brought the suit in the first instance; but, failing to do so, it was properly brought by the Custodian. In the suit thus brought the petitioner's rights can be fully protected. Indeed, according to its own showing, it has made a settlement with the defendant Anchor Packing Company, covering all its rights and interests in the royalties in question, and as a return of its trade-mark cannot now be made, it is difficult to see what interest it has to make the pending application.

In view of this settlement, petitioner's assertion that it is moved to make this application to enable it to discontinue the suit and thus save the Anchor Packing Company the additional expense to fall upon it, if the suit is further prosecuted, without more, is sufficient reason for denying it. At any rate, it is not enough to move the discretion of the court, assuming that it has discretion in the matter, to grant its petition. If the suit is unduly prolonged, or attended with unnecessary expense, the defendant injured thereby may invoke the court to prevent either or both.

The petition for substitution as plaintiff is denied.