**RIVERBANK LABORATORIES,**
a corporation
v.
**HARDWOOD PRODUCTS CORPORATION, a corporation.**
No. 54 C 300.

United States District Court
N. D. Illinois.
June 13, 1958.

William J. Friedman, Maurice Rosenfield, Philip B. Kurland, Harry Kalven, Jr., Chicago, Ill., for plaintiff, Burton H. Young, Wallace Rudolph, Chicago, Ill., of counsel.

Gerrit P. Groen, Chicago, Ill., Arthur H. Seidel, Milwaukee, Wis., Richard E. Alexander, Chicago, Ill., for defendant, Quarles, Herriott & Clemons, Milwaukee, Wis., Byron, Hume, Groen & Clement, Chicago, Ill., of counsel.

JULIUS J. HOFFMAN, District Judge.

This is a common-law action for unfair competition in which the plaintiff seeks to restrain the defendant from using the name "Riverbank" on sound insulating doors manufactured by defendant. Plaintiff also seeks damages for disparagement of its trade name. Federal jurisdiction is properly predicated upon diversity of citizenship, and the amount in controversy, exclusive of interest and costs, exceeds $3,000.

Plaintiff, Riverbank Laboratories, was founded in 1913 by one George Fabyan at Geneva, Illinois, as a not-for-profit sole proprietorship. In 1921, the proprietorship became a not-for-profit Illinois corporation. Initially, various areas of scientific and quasi-scientific endeavor were embraced by plaintiff: acoustics, electronics, genetics, cryptography, and Shakespearian studies involving the Shakespeare-Bacon controversy. However, since 1936, plaintiff has not engaged in genetics, cryptography or literary controversy.

The principal activity of plaintiff has been in the field of acoustical physics with acoustical and engineering divisions. The work of the engineering division has been devoted almost exclusively to tuning-forks and related electronic and electro-mechanical devices, and from June 13, 1954 (four months after the

instant action was filed) to June 15, 1956, the engineering division expanded its activity to embrace the development or improvement of sound insulating doors. Such work has been suspended since June 15, 1956.

Beginning in 1927, the engineering division, guided by the late Bert Eisenhour, Sr., contributed substaintially to the development of an improved tuning-fork with a variety of acoustical, medical, electronic and electro-mechanical uses. These forks and related devices are manufactured and sold by plaintiff. The forks bear the stamped name "Riverbank Laboratories" with the exception of one type of fork known as "Eisenhour," and the words "Riverbank Laboratories" appear on the packaging of forks and upon related commercial documents. The forks are unrelated to the building trade, and there is no evidence that any buyer of Riverbank tuning-forks was an architect, or was otherwise engaged in millwork or woodwork construction, building construction, or the manufacture of building materials. With the exception of certain listings, the engineering division does virtually no advertising, and its average yearly gross sales are approximately $250,000.

In addition to the manufacture and sale of tuning-forks and related devices, the engineering division engages in pure research and testing activities, and has set standards for scientific measurement which were unknown prior to the development of the improved tuning-fork at the plaintiff's laboratories.

The activities of the acoustical division of the plaintiff began in 1918, when Fabyan built an acoustical laboratory for Professor Wallace Sabine, then head of the Physics Department of Harvard University. However, Professor Sabine died before he could assume any duties, and he was replaced by Dr. Paul Sabine who took charge of plaintiff's acoustical-experimental activities. Plaintiff's acoustical laboratory was the first laboratory devoted exclusively to acoustics and available for commercial testing of acoustical materials for sound insulation and sound absorption qualities. In 1933, The Acoustical Materials Association, comprising the principal manufacturers of acoustical materials in the United States, selected the plaintiff to perform all its official tests. The acoustical laboratory, at present completely operated by Armour Research Foundation, is now regarded as the best acoustical testing laboratory in the United States.

Certain of Dr. Sabine's work culminated early in 1934 with the invention of a sound insulating door embodying a floating panel construction. Sabine applied for a patent in May, 1935, and the patent was issued on May 11, 1937. Plaintiff was given a one-half interest in the patent.

In 1934, following the invention of the door, Sabine invited Frederick Ludlow to aid in the commercial exploitation of the door. Ludlow had prior experience in the manufacture of doors. Ludlow and Sabine worked for approximately ten months attempting to fabricate model doors embodying Sabine's invention. In October, 1934, the door was apparently ready for marketing, and arrangements were made to advertise the door in "Sweet's Catalogue," a national trade journal. The advertisement was paid for by plaintiff; advertising negotiations were handled by Sabine and Ludlow, purporting to act for plaintiff; and the door was advertised as:

"Riverbank Laboratories
Sound Insulating Doors
Geneva, Illinois

Riverbank Sound Insulating Doors
A Laboratory Product"

This appears to be the first time that the door was denominated "Riverbank." Prior to November 3, 1934, six doors were sold to Johns-Manville. However, the record is silent as to whether the doors were sold under the name of plaintiff or as a result of plaintiff's reputation.

As early as November 3, 1934, Sabine and Ludlow contemplated some form of business structure through which the door could be marketed. On April 1,

1935, an informal partnership, the "Riverbank Insulating Door Company" (hereafter, "Door Company"), was formed, comprising as partners Sabine, Ludlow and plaintiff. A formal partnership agreement was executed on February 28, 1937, effective January 1, 1937. The record does not disclose the manner in which the partnership acquired the name "Riverbank," but it may fairly be assumed that plaintiff consented to such use.

In October, 1935, the Door Company advertised the door in "Sweet's Catalogue" as follows:

"Riverbank Insulating Door Co.
Riverbank Laboratories
Geneva, Ill.

Riverbank Sound-Insulating Doors"

Thereafter, neither the plaintiff nor the Door Company again advertised the door.

Prior to September 14, 1936, the Door Company (acting through Sabine and Ludlow rather than through plaintiff) marketed, but did not manufacture, the door, although on five occasions all or a part of the correspondence pertaining to sales was addressed to plaintiff. From late 1934 to September 14, 1936, no more than thirteen sales were consummated. During the same period, approximately sixty-three inquiries were received. However, there is no evidence that any sale was made or that any inquiry was received as a result of the reputation of the name "Riverbank."

From March, 1935, to August, 1935, defendant, then and now a Wisconsin corporation, manufactured wood components and assembled doors for the Door Company. Defendant had manufactured doors since 1910, sound insulating doors since 1930, and was well regarded in the trade. From August, 1935, to September, 1936, defendant acted also as sales agent on a commission basis. During the period March, 1935, to September, 1936, defendant, through its officers and salesmen, materially aided the Door Company in the commercial exploitation of the Riverbank door. Also during this period, Sabine and Ludlow, acting for the Door Company, manifested a desire to turn over to defendant the commercial exploitation of the door. The activities of the Door Company, as noted above, produced, *at best,* only moderate results and it was essential that the Door Company ally itself with a reputable manufacturer. Ludlow, who handled the major part of the Door Company's exploitation activities, held himself out to the trade as a representative, not of the Door Company, but of defendant in what clearly was an attempt to capitalize on the reputation of defendant. Further, the Door Company's second advertisement in Sweet's Catalogue emphasized the fact that defendant was the manufacturer of the door. On September 14, 1936, defendant and the Door Company entered into an exclusive licensing agreement under which defendant was authorized to manufacture, promote and sell "Riverbank sound insulating doors" upon payment of a stipulated royalty. Defendant agreed to manufacture no other sound insulating door. The agreement specified no time limit, but was terminable by either party upon ninety days written notice. Thereafter, and until June, 1954, defendant manufactured, promoted and sold the door under the name "Riverbank," and defendant's activities produced almost immediate results. Throughout the period, neither the Door Company nor plaintiff exercised any appreciable control over the promotion or sale of doors by defendant. However, Sabine, Ludlow and defendant consulted regarding technical aspects of manufacture.

In May, 1942, the Door Company and Firecraft Door Company entered into an agreement under which the latter was authorized to manufacture, advertise and sell "Metal-covered Riverbank Sound Insulating Doors" upon payment of a stipulated commission. It was expressly stated that, upon termination of the agreement, the name "Riverbank" would revert to the Door Company. Defendant was not a party to the agreement with Firecraft, but acquiesced in it, and manu-

factured wood cores which were metal-covered by Firecraft.

On January 14, 1947, following the ·retirement of Dr. Sabine as director of plaintiff's acoustical laboratory, plaintiff leased its acoustical laboratory to the Armour Research Foundation of the Illinois Institute of Technology. Consideration for the lease was $1.00 plus Armour's undertaking to pay to plaintiff a stipulated percentage of revenue derived from testing activities. The agreement, which was limited to a ten year term, was renewed on July 10, 1956, for another ten year term. Since the date of the first agreement with Armour, plaintiff has not engaged in acoustical activities, aside from the work done by the engineering division; nor has plaintiff exercised any control over Armour. The original agreement specifically granted to Armour the right to use the name "Riverbank," and Armour has used it in its advertising. For ten years prior to the Armour agreement, plaintiff's acoustical laboratory had undergone no changes or improvement, and much of its equipment was obsolete. Accordingly, Armour initiated a program of revision and improvement to enable the laboratory to render more useful and accurate services to industry.

From the inception of the agreement between the Door Company and defendant, relations between the parties were amicable. During the period of the agreement, the Door Company received over $280,000 in royalties on gross sales of approximately $1,500,000, and defendant spent over $56,000 to advertise the "Riverbank Sound Insulating Door." Until the spring of 1953, defendant dealt only with Sabine and Ludlow as representatives of the Door Company. Sabine and Ludlow were, in fact, the managing partners of the Door Company. Defendant did not deal with plaintiff, but defendant was aware that plaintiff was a partner in the Door Company.

In 1950 Sabine and Ludlow agreed that defendant should take some action to assure the use by it of the name "Riverbank" after termination of the agreement, and Ludlow so informed defendant. Plaintiff was not notified of this decision by Sabine or Ludlow.

In July, 1950, defendant unsuccessfully attempted to secure a copyright on the name "Riverbank." On September 11, 1950, defendant, acting without the benefit of legal advice, initiated action to secure trade-mark rights in the name "Riverbank." These actions by defendant resulted from Ludlow's suggestion that defendant take steps to protect its use of the name.[1] In December, 1951, the Patent Office granted to defendant a trade-mark on the name "Riverbank" for sound insulating doors. Defendant used the name as a trade-mark until June, 1954, when the usage was restrained by preliminary injunction, subsequently set aside on appeal. Riverbank Laboratories v. Hardwood Products Corp., 7 Cir., 1956, 236 F.2d 255. Although the trade-mark is still in effect, defendant has offered to cancel it.

In the spring of 1953, Maulsby Forrest, one of plaintiff's officers, met with Ludlow and learned that Sabine and Ludlow did not want to continue the Door Company partnership beyond expiration of the patent. Forrest learned also of Ludlow's suggestion to defendant to protect its use of the name "Riverbank." This was the first information plaintiff received of the action taken by defendant. In May, 1953, Forrest gave notice to defendant that the agreement would be cancelled as of May 11, 1954, the date on which the patent was to expire. In October, 1953, Forrest attempted unsuccessfully to negotiate a new agreement with defendant. On December 2, 1953, Forrest received a letter from defendant and learned, for the first time, that defendant had secured a trade-mark. On December 28, 1953, Forrest can-

---

1. In reaching this conclusion, I have considered and rejected plaintiff's attempt to prove that Ludlow's suggestion to defendant was made *after* defendant attempted to secure a copyright. The incident occurred some seven years prior to trial, and the disparity of dates might be attributed to lapse of time.

celled the agreement as of ninety days from receipt of notice. However, attorneys for Sabine and Ludlow countermanded the cancellation in a letter to defendant, and defendant, relying on the letter of countermand, considered the contract in force. Subsequently, defendant served timely notice that it would consider the contract cancelled as of May 11, 1954.

The instant action was filed on February 25, 1954. Sometime after June, 1954, Forrest wrote to Morgan Sash and Door Company, a manufacturer, with a view to entering into a new contract. As a result of this letter, Forrest met with Arthur Chapman, an officer of Morgan. Chapman indicated Morgan's interest in manufacturing sound insulating doors under the name "Riverbank," but Morgan was deterred by the pendency of the instant action. Morgan did no more than indicate to plaintiff its preliminary interest, and there were no negotiations between the parties.

In the spring of 1955, the witness Harvey Pushker, a close friend of one of plaintiff's counsel, communicated with Forrest, at the suggestion of this lawyer, regarding the manufacture of sound insulating doors under the name "Riverbank." Pushker received a firm commitment from a manufacturer and offered Forrest five per cent in royalties with a guaranteed minimum of twenty to twenty-five thousand dollars for the "right" to manufacture sound insulating doors under the name "Riverbank" and to advertise them as being designed and sponsored by plaintiff. However, the matter was held in abeyance pending the outcome of this trial.[2]

In February, 1955, plaintiff bought from Sabine any interest which he might have in the patent, effective as of March 30, 1954. On January 28, 1955, Sabine and Ludlow assigned to plaintiff their entire interest in the Door Company.

*Basis of Plaintiff's Claims for Relief*

As a result of defendant's continued use of the name "Riverbank" beyond the date on which the patent expired, and defendant's asserted right to use the name, plaintiff filed this suit. Plaintiff does not seek to protect a trade-mark. On the contrary, plaintiff admits that it never had trade-mark rights in the name "Riverbank." However, plaintiff contends that the name "Riverbank" is its trade name, and deserves protection as such. It is beyond question that plaintiff's correct corporate name is "Riverbank Laboratories."

Although the complaint is not specifically divided into counts, it is clear that plaintiff asserts several overlapping claims for relief. While these claims are encompassed by the broad term "unfair competition," in the interest of clarity I shall state them separately. Paragraphs 11, 14, 16, and 20(A), (B) and (C) of the complaint allege unfair competition arising from *confusion of sponsorship*. In addition, plaintiff asserts a claim was *disparagement of trade name*. The precise words "disparagement of trade name" appear nowhere in the complaint. The disparagement claim was first specifically mentioned in plaintiff's opening statement on the trial (tr. 5–6) and was pursued further in plaintiff's brief. Although defendant vigorously attacks the claim as belated and not alleged in the complaint, I shall, for purposes of this memorandum, assume that the disparagement claim is before the court.[3]

It is clear that the validity of both of plaintiff's claims depends upon plaintiff's exclusive right to the name "Riverbank" as used on sound insulating doors.

2. At the trial, Pushker's testimony was admitted subject to objection by defendant which was to be ruled upon in this memorandum. Since the objection was essentially to the weight of the evidence rather than its admissibility, the objection is now overruled. Pushker's testimony, therefore, has been considered for what it is worth.

3. Plaintiff originally alleged a claim for patent infringement (Complaint, par. 21). This claim has been abandoned (Pl.Br., p. 29, fn. 3; Pl.Reply Br., p. 2) and will not be considered further.

## Choice of Law

■ As noted previously, this is a common-law action for unfair competition, and jurisdiction is based on diversity of citizenship. Under the rule announced in Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, this court must apply the substantive law of Illinois, including Illinois rules of conflict of laws. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. It has been held specifically that the Erie doctrine applies to the common-law action of unfair competition. Pecheur Lozenge Co., Inc., v. National Candy Co., Inc., 1942, 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103; Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73.

■ Unfair competition is a tort. Under Illinois law, a tort is governed by the law of that state in which the cause of action arose, Opp v. Pryor, 1920, 294 Ill. 538, 128 N.E. 580, or, as sometimes stated, by the law of that state in which the wrong was consummated. Addressograph-Multigraph Corporation v. American Expansion Bolt & Mfg. Co., 7 Cir., 1941, 124 F.2d 706, certiorari denied 1942, 316 U.S. 682, 62 S.Ct. 1270, 86 L.Ed. 1755. In the Addressograph case it was asserted that the state in which the wrong was consummated is the state in which the essential element of the wrongful competitive act took place. Where defendant transacts all, or substantially all, of its business in one state, the action will usually be governed by the law of that state. Rytex Co. v. Ryan, 7 Cir., 1942, 126 F.2d 952; Time, Inc., v. Viobin Corp., 7 Cir., 1942, 128 F.2d 860, certiorari denied 1942, 317 U.S. 673, 63 S.Ct. 78, 87 L.Ed. 540;[4] Radio Shack Corp. v. Radio Shack, Inc., 7 Cir., 1950, 180 F.2d 200; Jewel Tea Co. v. Kraus, 7 Cir., 1950, 187 F.2d 278.

■ Applying the "essential element" test of the Addressograph case, it is clear that the gist of plaintiff's complaint is that defendant has exercised wrongful dominion over the name "Riverbank." This dominion was first manifested in Wisconsin when defendant endeavored to secure a copyright. Again, it was in Wisconsin that the defendant initiated action which culminated in the issuance of a trade-mark. The essential elements of the allegedly wrongful competitive act, therefore, occurred in Wisconsin, and the substantive aspects of this case must be governed by Wisconsin law.

Research discloses no Wisconsin case in which plaintiff's claim for relief was predicated upon confusion of sponsorship. Further, there appears to be no Wisconsin case in which plaintiff relied upon the theory of disparagement or in which plaintiff instituted the related action of libel or slander of title. Accordingly, I have proceeded upon the assumption that the Wisconsin law of unfair competition is sufficiently broad to embrace the claims relied upon by plaintiff. Where necessary, general authorities will be relied upon.

## Gravamen of Unfair Competition

■ Unquestionably, plaintiff has the right to use the word "Riverbank" as a trade name indicating the source of its activities, products and services and the attending good-will. The word "Riverbank" is fanciful and arbitrarily applied. Listman Mill Co. v. Wm. Listman Milling Co., 1894, 88 Wis. 334, 60 N.W. 261 (holding that the word "Marvel," as applied to plaintiff's flour, was an arbitrary designation indicating source, and was a valid mark); Avenarius v. Kornely, 1909, 139 Wis. 247, 121 N.W. 336 (holding that the word "carbolineum" was an arbitrary or fanciful word indicating the origin of plaintiff's paint, and was a valid mark). However, the question is whether plaintiff has an exclusive right to the

---

4. Both the Rytex and Time cases were overruled in part on other grounds in Philco Corporation v. Phillips Mfg. Co., 7 Cir., 1943, 133 F.2d 663, 148 A.L.R.

125. In addition, the Rytex case was again overruled on other grounds in Barbasol Co. v. Jacobs, 7 Cir., 1947, 160 F.2d 336.

word "Riverbank" as applied to sound insulating doors. This exclusive right is an essential element of plaintiff's claims under the dual theories of confusion of sponsorship and disparagement.

■■ In determining whether plaintiff has this exclusive right, it will be helpful to review and restate some of the concepts which underlie an action for unfair competition. "Likelihood of confusion" is a key phrase. Where plaintiff engages in an endeavor under a corporate or a trade name or markets an item under a trade-mark, and defendant appropriates the name or mark, an action for unfair competition will lie if the public is, in fact, confused, or if it is likely that the public will be confused. This rule has been applied by Wisconsin courts. Manitowoc Malting Co. v. Milwaukee Malting Co., 1903, 119 Wis. 543, 97 N.W. 389; Phoenix Manufacturing Co. v. White, 1912, 149 Wis. 287, 135 N.W. 891; Milwaukee Corrugating Co. v. Flagge, 1924, 184 Wis. 139, 198 N.W. 394. It has been announced in a multitude of cases in this circuit. California Fruit Growers Exchange v. Sunkist Baking Co., 7 Cir., 1947, 166 F.2d 971; Consumers Petroleum Co. v. Consumers Co. of Ill., 7 Cir., 1948, 169 F.2d 153, certiorari denied 1949, 335 U.S. 902, 69 S.Ct. 406, 93 L.Ed. 437; Radio Shack Corp. v. Radio Shack, Inc., 7 Cir., 1950, 180 F.2d 200; Independent Nail & Packing Co. v. Stronghold Screw Products, 7 Cir., 1953, 205 F.2d 921, certiorari denied 1953, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391; Keller Products v. Rubber Linings Corp., 7 Cir., 1954, 213 F.2d 382, 47 A.L.R.2d 1108; Square D. Co. v. Sorenson, 7 Cir., 1955, 224 F.2d 61; G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 1956, 231 F.2d 316; National Nut Co. v. Kelling Nut Co., D.C.N.D.Ill.1945, 61 F.Supp. 76. And it has been expressed in other jurisdictions. Indian Territory Oil & Gas Co. v. Indian Territory Illuminating Oil Co., 10 Cir., 1938, 95 F.2d 711, certiorari denied 1938, 305 U.S. 607, 59 S.Ct. 67, 83 L.Ed. 386; Little Tavern Shops v. Davis, 4 Cir., 1941, 116 F.2d 903; Sears, Roebuck and Co. v. Johnson, 3 Cir., 1955, 219 F.2d 590; National Lead Co. v. Wolfe, 9 Cir., 1955, 223 F.2d 195, certiorari denied 1955, 350 U.S. 883, 76 S.Ct. 135, 100 L. Ed. 778; Abramson v. Coro, Inc., 5 Cir., 1957, 240 F.2d 854; see also cases collected in Annotations, 66 A.L.R. at page 972; 115 A.L.R. at page 1247; and 148 A.L.R. 12.

The term "confusion" means that the public will attribute to plaintiff defendant's product or service. The public may believe that defendant's product is manufactured by plaintiff, National Lead Co. v. Wolfe, 9 Cir., 1955, 223 F.2d 195, certiorari denied 1955, 350 U.S. 883, 76 S. Ct. 135, 100 L.Ed. 778; or is sold by plaintiff, Radio Shack Corp. v. Radio Shack, Inc., 7 Cir., 1950, 180 F.2d 200; or is sponsored by plaintiff, Triangle Publications v. Rohrlich, 2 Cir., 1948, 167 F.2d 969 (held that defendant's use of word "Seventeen" on girdles infringed and unfairly competed with plaintiff's use of the word as title of magazine). The public may believe that defendant's service is rendered by plaintiff, Sears, Roebuck and Co. v. Johnson, 3 Cir., 1955, 219 F.2d 590; or that plaintiff and defendant are related, Aetna Casualty & Surety Co. v. Aetna Auto Finance, Inc., 5 Cir., 1941, 123 F.2d 582, certiorari denied 1941, 315 U.S. 824, 62 S.Ct. 917, 86 L.Ed. 1220. As stated in the Radio Shack case, 180 F.2d at page 206:

"* * * it is the confusion of origin or sponsorship, and not the confusion of goods, which is the controlling factor. A corporation may build up a fine reputation for financial responsibility, and business integrity and fair dealing, in the field within which it transacts its business, in which event its trade name should ordinarily be entitled to protection. The wrong in this case consists in a realization on the plaintiff's general reputation—an appropriation of plaintiff's good will by confusing the minds of prospective customers as to the identity of the dealer who is offering goods to the public. In all cases of unfair compe-

tition, it is principles of old fashioned honesty which are controlling. J. I. Case Plow Works v. J. I. Case Threshing Machine Co., 162 Wis. 185, 201, 155 N.W. 128."

The Radio Shack case introduces another aspect of unfair competition which is related to "confusion": the wrong committed by defendant. As the quotation from the opinion in that case indicates, the court viewed the wrong as defendant's realizing on the plaintiff's reputation or appropriating plaintiff's good will. Other theories of the wrong committed by defendant are: forestalling plaintiff's normal potential expansion;[5] unjust enrichment; falsely creating an impression of a relationship between plaintiff and defendant, so that plaintiff might be subjected to litigation; and "dilution" of the selling appeal of a trade name.[6] See 148 A.L.R. 12, 66, for a comprehensive review of cases supporting these respective theories. These theories, with the exception of the "dilution" theory, have as a common ground the abhorrence of permitting one indiscriminately to capitalize on the efforts of another. As stated in J. I. Case Plow Works v. J. I. Case Threshing Machine Co., 1915, 162 Wis. 185, 155 N.W. 128, 134:

"One man may not reap where another has sown, nor gather where another has strewn."

The concepts of "confusion" and "capitalization" rest upon a foundation of semantics. Obviously, if the relevant buying public, upon hearing or seeing the mark or name in question, *as used by defendant*, does not associate that mark or name with plaintiff, there can be no confusion; nor is defendant capitalizing upon plaintiff's efforts or reputation or good-will. In California Fruit Growers Exchange v. Sunkist Baking Co., 7 Cir., 1947, 166 F.2d 971, plaintiff sought to enjoin the use of its mark "Sunkist" on bread made by defendant. Plaintiff asserted, and the court agreed, that:

"It is a confusion of origin or sponsorship and not a confusion of goods which controls. * * *" (at page 973)

In holding that the likelihood of confusion did not exist, the court stated, at page 973:

"Unless 'Sunkist' covers everything edible under the sun, we cannot believe that anyone whose I.Q. is high enough to be regarded by the law would ever be confused or would be likely to be confused in the purchase of a loaf of bread branded as 'Sunkist' because someone else sold fruits and vegetables under that name."

Plaintiff had called as witnesses certain of its officers who testified that confusion was a likely result of defendant's use of the word "Sunkist." However, the court observed at page 975:

"No prospective purchasers gave any such opinion. Indeed, the many housewives called were not in the least confused."

In essence, the court held that, since the relevant buying public, upon seeing the name "Sunkist" as used by defendant, did not associate that name with plaintiff, an action for unfair competition would not lie.

In American Photographic Publishing Co. v. Ziff-Davis Publishing Co., 7 Cir., 1943, 135 F.2d 569, plaintiff had published a magazine known as "Popular Photography." Subsequently, the maga-

---

5. This theory cannot be applied in the case at bar. I find as a fact that it is not likely that plaintiff will ever expand its activity to engage in the highly specialized manufacture of sound insulating doors.

6. The "dilution" theory, first advocated in an article by Schechter, The Rational Basis of Trademark Protection, 40 Harv. L. 813 (1940), at least by implication has been rejected by this circuit. California Fruit Growers Exchange v. Sunkist Baking Co., 7 Cir., 1947, 166 F.2d 971. Under the "dilution" theory, the value of a mark or name inheres in its uniqueness. Consequently, protection would be afforded even in the absence of confusion or the likelihood of confusion.

zine was merged with "American Photography" and was published under the latter name for twenty years. Defendant then acquired a trade-mark in the name "Popular Photography," and published a magazine under that name. In holding that plaintiff had no claim for common-law trade-mark infringement and unfair competition, the court stated, at page 572:

"It is clear that the voracious 'American Photography' has swallowed the former periodicals, and that ample time has elapsed for the digestive process to occur, so that absorption has resulted. * * *"

Again, the court was merely saying that the relevant buying public, upon seeing the name "Popular Photography", did not associate that name with plaintiff. Consequently, defendant's use did not constitute unfair competition.

In Bayer Co. v. United Drug Co., D.C. S.D.N.Y. 1921, 272 F. 505, plaintiff instituted an action for infringment of its common-law trade-mark "aspirin." At page 513, Judge Learned Hand commented:

"After all presumptions and other procedural advantages have been weighed, the owner must show that his mark means him, else he cannot prevent others from using it. There is no invention in the word, qua word, which he can protect."

Accordingly, plaintiff, in the case at bar, cannot prevail unless it has established, by a preponderance of the evidence, the likelihood that the relevant buying public, upon seeing the name "Riverbank" on defendant's door, will believe that plaintiff sponsors the door or otherwise vouches for its quality, as is alleged by plaintiff. That plaintiff was aware of this burden is apparent from plaintiff's brief:

"To the relevant public—architects, engineers and contractors— Riverbank means the Riverbank Laboratories and means quality * * *" (Pl.Br., p. 10)

Whether plaintiff has sustained this burden is a fact question. I am of the opinion that plaintiff has not sustained this burden.

In support of its contention as to the meaning of the word "Riverbank," plaintiff called one witness who testified regarding plaintiff's reputation for scientific eminence. Until 1939 plaintiff had an international reputation for scientific excellence. This reputation is attributable substantially, if not almost entirely, to the acoustical-physics work and scientific writing of Dr. Sabine. Dr. Sabine's work decreased markedly from 1939 to 1947. Although the Riverbank Acoustical Laboratory is still highly regarded today by scientists, much of its reputation is as a result of the work and professional standing of Armour. However, the basic question is not whether plaintiff has a reputation for scientific excellence among scientists, but whether it has such a reputation or any reputation among the relevant buying public: architects, engineers and contractors. The only evidence relied upon by plaintiff as bearing on this basic question was the testimony of one Wallace Waterfall and certain advertising material (Pl.Br., p. 10). That portion of Waterfall's testimony, upon which plaintiff heavily relies, is as follows:

"Q. [On direct examination.] Is there any familiar term by which you and the people in the acoustical field commonly refer to Riverbank Laboratories? A. Yes, Riverbank. Riverbank in the acoustical field means nothing besides Riverbank Laboratories to most everyone." [Tr. 651.]

"The Court: I would like to ask him one question before he goes to the cross. As a man well informed in the field of acoustics, Mr. Waterfall, do you know something about sound insulating doors?

"The Witness: Not too much, your Honor.

"The Court: I don't mean mechanically, but if you saw the name Riv-

erbank on a sound insulating door, what would that mean to you as an expert in this field?

"The Witness: That would mean it was a door that had been developed by Paul Sabine at Riverbank Laboratories, because I remember when he was doing the work out there.

"The Court: What would it mean as to quality?

"The Witness: If it were made according to the original designs that he worked at, it would be a good quality door." [Tr. 656–7.]

However, it must be noted (1) that Waterfall was not shown to be a member of the relevant buying public and did not purport to speak for the relevant buying public; and (2) that he was personally acquainted with Dr. Sabine and plaintiff. Since Waterfall was not shown to be a member of the relevant buying public, his statements do not answer the question whether it is likely that the members of the relevant buying public associate the name "Riverbank," as used on doors, with plaintiff. Even if Waterfall were a member of the relevant buying public, his personal acquaintance with Dr. Sabine and plaintiff would render his testimony of doubtful probative value unless it were also shown that a reasonable portion of the relevant buying public knew of Sabine and plaintiff. Waterfall's testimony falls far short of establishing the likelihood that plaintiff has any reputation among the buyers of sound insulating doors; and plaintiff introduced no additional testimony on this issue.

The advertising materials relied upon by plaintiff are contained in Exhibits AAA 1–9 and Exhibit EEE, p. 14. Exhibits AAA 1–9 are brochures published by or for the defendant during the period of the exclusive licensing agreement. Exhibits AAA–1, 2, 5, 6 and 8 contain the following:

"The Riverbank Sound Insulating Door is the result of scientific knowledge gained by experiment in the laboratory plus practical knowledge gained by experience in making doors. Scientific knowledge of the fundamental physical principles underlying the transmission of sound in building has come out of the research carried on at the Riverbank Laboratories during the last 15 years."

Exhibits AAA–4, 7 and 9 are substantially similar and refer to:

"* * * extensive research carried on by Dr. Paul E. Sabine at the Riverbank Acoustical Laboratories * * *"

Exhibit AAA–3 refers to the doors as:

"* * * designed along new and thoroughly scientific lines by the Riverbank Acoustical Laboratories."

Exhibit EEE is a brochure of the Firecraft Company, manufacturers of metal covered sound insulating doors. At page 14 is a reference to decibel reduction based on tests carried on by plaintiff. These exhibits, too, fall short of establishing the likelihood that plaintiff's reputation was known to the relevant buying public or that the public attributed sponsorship to plaintiff. The difficulty inherent in plaintiff's position is that plaintiff introduced no evidence showing or tending to show a relationship between plaintiff's reputation among scientists and plaintiff's alleged reputation among the relevant buying public. Plaintiff called no witness who ever ordered or bought a Riverbank door, or who might be remotely classified as a potential member of the relevant buying public.

Defendant called the only trade witnesses who testified at the trial. The witness Watson was an official of the largest custom-built architectural woodwork firm in Chicago. He had been engaged in the sash and door business for forty-eight years, and frequently ordered Riverbank doors from defendant. To him, "Riverbank" meant only a door manufactured by defendant. He did not look to the plaintiff or the Door Company as a guarantor of the door. The

witness Koll was the vice-president of a concern which manufactured architectural woodwork. His testimony was substantially the same as that of Watson. To this affirmative testimony regarding the meaning of the name "Riverbank" among the relevant buying public may be added the testimony of defendant's vice-president Young and Mr. Ludlow that plaintiff had no reputation among the relevant buying public at the time the door was developed.

It is clear, therefore, that plaintiff does not have a reputation for scientific excellence among the individuals who order and buy sound insulating doors; and that the relevant buying public, upon seeing the name "Riverbank" on sound insulating doors, would not attribute sponsorship of those doors to plaintiff, nor look to plaintiff as a source of supply or source of quality control; and that it is not likely that the relevant buying public would be confused, deceived or misled by defendant's use of the word "Riverbank." The evidence does not show that the defendant attempted to capitalize upon the reputation of plaintiff or to obtain a commercial "free ride" at plaintiff's expense. Certainly there is no relation between acoustical physics in general and the commercial aspects of sound insulation of such a nature as would justify a conclusion that reputation for excellence in acoustical physics carries over into the commercial door field; nor is there a relation between the market for tuning forks and related electro-mechanical and electronic devices and the market for sound insulating doors.

*Reversionary Rights*

Plaintiff asserts that, since the agreement between the parties was a license, the name "Riverbank" reverted to plaintiff upon termination of the agreement. Initially, it must be noted that almost all the cases cited in this memorandum dealing with the theories and elements of unfair competition do not involve agreement between the parties.[7]

The questions thus presented are whether the existence and subsequent termination of an agreement are *per se* dispositive factors, or whether, in such cases, the decisions are still predicated upon the concepts of unfair competition above discussed. Plaintiff relies on Smith v. Dental Products Co., 7 Cir., 1944, 140 F.2d 140, certiorari denied 1944, 322 U.S. 743, 64 S.Ct. 1146, 88 L.Ed. 1576; United States Ozone Co. v. United States Ozone Co. of America, 7 Cir., 1932, 62 F.2d 881; Morand Brothers v. Chippewa Springs Corp., 7 Cir., 1924, 2 F.2d 237, certiorari denied 1924, 267 U.S. 592, 45 S.Ct. 229, 69 L.Ed. 803; Hicks v. Anchor Packing Co., 3 Cir., 1926, 16 F.2d 723; and Stratton & Terstegge Co. v. Stiglitz Furnace Co., 1935, 258 Ky. 678, 81 S. W.2d 1. Plaintiff reads these cases as standing for a rule-of-thumb that "upon the expiration of a license of a trade name, the name reverts to the owner" (Pl.Br., p. 22), and there is some language in these cases tending to sustain that view. However, a careful reading of these cases indicates that they do not support the rule contended for. To the contrary, they embrace the same concepts of unfair competition discussed above, and under which plaintiff cannot prevail.

The case most nearly in point is Smith v. Dental Products Co., 7 Cir., 1944, 140 F.2d 140, certiorari denied 1944, 322 U.S. 743, 64 S.Ct. 1146, 88 L.Ed. 1576. There, plaintiff was a dentist and oral surgeon of nation-wide reputation who developed certain dental equipment and acquired trade-marks thereon. For four years plaintiff demonstrated his equipment to almost all the dental schools and state dental societies in the United States, and created a considerable demand for the equipment. The relevant buying public associated the trade-marked equipment with plaintiff. To supply the demand, plaintiff licensed to the defendant the use of the trade-marks and defendant manufactured and sold the equipment.

---

7. Only in Phoenix Mfg. Co. v. White, 1912, 149 Wis. 287, 135 N.W. 891, was the court concerned with a license agreement.

Upon cancellation of the agreement defendant continued to manufacture the equipment under plaintiff's trade-marks, and plaintiff instituted and ultimately prevailed in an action for trade-mark infringement and unfair competition. This recital of facts indicates clearly that defendant was attempting to capitalize on plaintiff's reputation in a market already established by plaintiff. Further, it was found that defendant's activities deceived the public. Consequently, the case falls within the ambit of established concepts of unfair competition. The result in Smith would have been the same absent an agreement between the parties. In United States Ozone Co. v. United States Ozone Co. of America, 7 Cir., 1932, 62 F.2d 881, plaintiff's predecessor manufactured and sold trade-marked water purification equipment. The court specifically found that:

> "Before any contract was entered into with Montgomery Bros. [defendant's predecessor] and since, the products of the sterilizer company have been identified in the public mind by the name 'United States Ozone Company.'" 62 F.2d at page 886.

Subsequently, defendant's predecessor was permitted to sell the trade-marked equipment on the west coast; and later defendant's predecessor became a nation-wide exclusive sales agent. Following the bankruptcy of plaintiff's predecessor, defendant was organized by Montgomery Brothers, usurped the corporate title of plaintiff's predecessor, and *manufactured* and sold purification equipment under the trade-marks of plaintiff's predecessor. It was held that defendant committed unfair competition. The defendant was capitalizing upon the good will and reputation of a name already established in the market. The public was deceived by defendant's acts; and the result of the case would have been the same even if there had been no agreement between the parties. Morand Brothers v. Chippewa Springs Corp., 7 Cir., 1924, 2 F.2d 237, certiorari denied 1924, 267 U.S. 592, 45 S.Ct. 229, 69 L.Ed. 803, involved only an action for trade-mark infringement. Plaintiff owned a mineral spring and bottled and sold mineral water under the trade-mark "Chippewa." For some time prior to the agreement with defendant, plaintiff distributed its product in the Chicago area. Plaintiff and defendant then entered into an agreement under which defendant, for a limited period of five years, undertook to distribute plaintiff's product in Chicago. Upon termination of the agreement, defendant, utilizing the waters of Lake Michigan, bottled and continued to distribute beverages labeled "Chippewa," and thus deceived the public. Although the case does not contain a detailed statement of facts, it is fairly inferable that the relevant buying public, upon seeing the mark "Chippewa," associated it with plaintiff's spring. Accordingly, defendant's use of the trade-mark constituted infringement. In Stratton & Terstegge Co. v. Stiglitz Furnace Co., 1935, 258 Ky. 678, 81 S. W.2d 1, the Kruse and Dewenter Company manufactured furnaces under the trade-mark "Monarch." Plaintiff was an exclusive sales agent in Kentucky and sold these furnaces under its own name but with the trade-mark. The court specifically found:

> "There was evidence, however, showing that among the trade generally it was known that the Kruse & Dewenter Company was the manufacturer of this furnace." 81 S.W. 2d at page 2.

Upon termination of the agency agreement between Kruse and plaintiff, defendant was made Kruse's sales agent. Plaintiff then commenced to sell the furnace of another manufacturer. However, plaintiff continued to use the trade-mark "Monarch," attempted to prohibit defendant's use of the mark, and was denied relief. Again, the case falls within established concepts of unfair competition since the relevant buying public, upon seeing the name "Monarch" as used by plaintiff, would be misled into believing that Kruse & Dewenter manufactured plaintiff's furnaces. Clearly

there was a confusion of source and deception of the public. Again, the result of the case would have been the same absent an agreement between plaintiff and the manufacturer. Hicks v. Anchor Packing Co., 3 Cir., 1926, 16 F.2d 723, rests upon the same principle since the opinion discloses that for many years prior to the agreement, the licensor had an established business for the sale of its foreign-made wares under the trademark "Tauril." See also Lawrence-Williams Co. v. Société Enfants Gombault et Cie., 6 Cir., 1927, 22 F.2d 512 certiorari denied 1927, 276 U.S. 619, 48 S.Ct. 214, 72 L.Ed. 735 (defendant, former sales agent, restrained from using trademark of plaintiff-licensor; facts showed that relevant buying public associated the trade-mark with product made by plaintiff); Medd v. Boyd Wagner, Inc., D.C.N.D.Ohio 1955, 132 F.Supp. 399, 400 (defendants, former licensees, restrained from using phrases "Dairy Queen" and "Cone with Curl on Top"; evidence showed that public regarded the user of these phrases as belonging to plaintiff's organization).

Consequently, I conclude that, although there is an agreement between the parties, the existence of unfair competition will be determined by the concepts and theories previously discussed. This conclusion finds affirmative support in Amiesite Asphalt Co. of America v. Interstate Amiesite Co., 3 Cir., 1934, 72 F.2d 946. There, plaintiff held patents and the trade-mark "Amiesite" on a paving compound. Defendant corporation was formed to manufacture and sell the compound, pursuant to a license, under plaintiff's trade-mark. Plaintiff consented to the use by defendant of the word "Amiesite" in defendant's corporate name. At the expiration of the patent and license agreement, defendant continued to manufacture the compound under the name "Amiesite," and plaintiff sought injunctive relief. In affirming a judgment for defendant, the court rested primarily upon its determination that the name "Amiesite" was the generic appellation of the compound. How-

ever, in a persuasive dictum, the court stated that defendant had special equities in the name. It was noted, at page 947:

"In the present case the defendant was the sole maker and seller, and its acts built up and gave value to the patented product and the name 'Amiesite.'"

Of greater significance is the following passage, at page 948:

"Moreover, the present case involves no confusion of goods or unethical conduct. The case is devoid of any proof either that defendant represented its product as that of plaintiff or that the public has been in any way misled."

While the Amiesite case was factually stronger for defendant than the case at bar, the above quotation applies with equal force and vigor to the case at bar and to the lack of evidence tending to establish the elements of unfair competition. The quotation indicates that even where a license exists between the parties, the court will attempt to ascertain the existence of confusion or public deception as a predicate for unfair competition.

Although there is no Wisconsin case in point, Phoenix Mfg. Co. v. White, 1912, 149 Wis. 287, 135 N.W. 891, 893, presents a related problem and indicates an approach. There, defendant invented and patented a saw swage (machine for broadening saw teeth), and gave to plaintiff an exclusive license to manufacture and sell the swage. Subsequently defendant conveyed his interest in the patent to his wife, and a new agreement was executed between the wife and plaintiff. As a result of the agreements, defendant embarked on the commercial exploitation of the swage and later improvements as "White Saw Swage," "New White Saw Swage" and "Improved White Swages." Thus, the devices became favorably known to the trade under the name "White." Defendant then patented a new swage and himself manufactured and sold it under the name

"New Improved White Swages." Thereupon plaintiff instituted an action for unfair competition. In holding that defendant was properly enjoined from using his own name (three judges dissenting), the court noted that plaintiff had established the market and the reputation of its product and name. The court noted further that defendant's acts confused and deceived the public and were likely to continue to do so. Although the case is distinguishable from the case at bar, the decision indicates the approach taken by the Wisconsin Supreme Court in protecting the party whose efforts have given substantial value to the name in the field in which protection is sought. Compare, President Suspender Co. v. Macwilliam, 2 Cir., 1916, 238 F. 159, certiorari denied 1916, 243 U.S. 636, 37 S.Ct. 399, 61 L.Ed. 941, where similar protection was afforded the manufacturer and seller by construing the agreement as an assignment rather than a license. If the name "Riverbank" has substantial value in the insulating door field, that fact can not be attributed to plaintiff or the Door Company; and, as has already been noted, the name "Riverbank" does not mean plaintiff in the insulating door field.

*Meaning of the name "Riverbank"*

There remains still another reason why plaintiff can not prevail in this action. As its primary defense, defendant asserts that the name "Riverbank" is the generic appellation for the sound insulating door invented by Dr. Sabine, and that, under the doctrine announced in Singer Mfg. Co. v. June Mfg. Co., 1896, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118, the name passed into the public domain upon expiration of the patent.

There is no rule of law that, upon the expiration of a patent, the name of the patented article passes into the public domain. In all cases it is a question of fact. As stated in Bayer Co. v. United Drug Co., D.C.S.D.N.Y.1921, 272 F. 505, 509:

"The single question, as I view it, in all these cases, is merely one of

fact: What do the buyers understand by the word for whose use the parties are contending?"

See also, Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 1953, 207 F.2d 190, 195; Derenberg, Trade-Mark Protection and Unfair Trading, p. 623 (1936); 3 Callman, Unfair Competition and Trade-Marks, 1160 ff. (2d ed. 1950); Handler and Pickett, Trade-Marks and Trade Names, 30 Col. L.Rev. 168, 187–8 (1930); Note, 102 U.Pa.L.Rev. 419, 421 (1954). If, as a matter of fact, the relevant buying public uses the name "Riverbank" to indicate "a sound insulating door embodying the floating panel construction invented by Dr. Sabine," as distinguished from other sound insulating doors (during the period of the agreement, other manufacturers produced sound insulating doors of different construction), the name is generic, and all manufacturers and sellers may use it. This rule is supported by policy considerations when an expired patent is involved, as stated in Scott Paper Co. v. Marcalus Co., 1945, 326 U.S. 249, 256, 66 S.Ct. 101, 104, 90 L. Ed. 47:

"By the force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly. Hence we have held that the patentee may not exclude the public from participating in that good will or secure, to any extent, a continuation of his monopoly by resorting to the trademark law and registering as a trademark any particular descriptive matter appearing in the specifications, drawings or claims of the expired patent, whether or not such matter describes essential elements of the invention or claims."

"Riverbank" is the generic name for the sound insulating door invented by Dr. Sabine and manufactured and sold

by defendant. This view is based in part on the testimony, previously referred to, of defendant's witnesses Watson (tr. 1008), Koll (tr. 1013–14), Ludlow (tr. 1272) and, to a lesser extent, Young (tr. 1030, 1048–49). While it is not necessary to set forth every exhibit in which the name "Riverbank" appears to be used as a synonym for "sound insulating door embodying a floating panel construction," it may be noted that in each advertisement of the door the relevant buying public was informed that the architect's specification is "Riverbank Sound Insulating Doors" (exs. A, Z, AAA 1–9). Further examples of what appears to be a generic use of the name are contained in ex. DDD; ex. QQQ, p. 4; ex. RRR, pp. 1–2; ex. TTT–5; ex. TTT–9; ex. UUU, p. 2; ex. 4, p. 42; ex. 6, pp. 4, 7, 28, 29, 31, 32.

▪▪▪ Plaintiff advances several arguments in opposition to defendant's contention that the name is generic. First, plaintiff asserts that the door is purchased by a limited class of expert buyers rather than by the general public, and that these expert buyers order by specification and not by shorthand label. This argument avails the plaintiff nothing. Although plaintiff's argument is factually correct, the question still remains: What do these expert buyers understand by the term "Riverbank?" Bayer Co. v. United Drug Co., D.C.S.D.N.Y.1921, 272 F. 505; Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 1953, 207 F.2d 190. Again, the stumbling block inherent in plaintiff's position is that plaintiff called no expert buyers as witnesses. The only buyers who testified were defense witnesses, and the preponderance of the evidence leads to the conclusion that the name "Riverbank" is generic. True, the doors are ordered on specification. But from 1935 on, buyers have been admonished to specify the door as "Riverbank," and it appears that they have done so (tr. 1012–13).

▪▪▪ Second, plaintiff argues that the name of a patented article does not become generic where it has achieved commercial value prior to the issuance of the patent. In support of this proposition, plaintiff relies upon Enders Razor Co. v. Christy Co., 6 Cir., 1936, 85 F.2d 195; McIlhenny Co. v. Bulliard, D.C.W.D.La.1920, 265 F. 705; President Suspender Co. v. Macwilliam, 2 Cir., 1916, 238 F. 159; Batcheller v. Thomson, 2 Cir., 1899, 93 F. 660; and Avenarius v. Kornely, 1909, 139 Wis. 247, 121 N.W. 336. Plaintiff misstates the rule for which these cases stand. The rule, first announced in the Batcheller case, is as follows: Cogent evidence that the name of a patented article is not generic is to be found in the facts that the name antedates the patent *and that the name has given commercial value to the article.* Obviously a name can not give commercial value to an article unless the name already has commercial value in the field embraced by the article. Since the name "Riverbank" had no commercial value in the sound insulating door field at the time Sabine invented his door (tr. 1257, 1266, 1270–72), there does not exist the factual predicate for applying the Batcheller rule.

▪▪▪ Third, plaintiff argues that the name of a patented article does not become generic where it has been associated with more than one product. In support of this argument plaintiff relies on Enders Razor Co. v. Christy Co., 6 Cir., 1936, 85 F.2d 195, and on the facts that prior to the development of the sound insulating door the name "Riverbank" was associated with tuning forks and cryptographic services. Overlooking the partial counter-argument that plaintiff has not engaged in cryptographic services since 1936, the Enders case does not support plaintiff's argument. There, plaintiff successfully sought to restrain the use by defendant of the words "Keen Kutter" as applied to razor blades. For many years, plaintiff had applied this name to an extensive line of cutlery products and cutting instruments, and the court found that the name, when so applied, indicated to the trade that plaintiff was the source of such products. However, the products, although differ-

ent, were in the same classification of cutting instruments, and apparently were sold through the same outlets. As the court stated, at page 198:

"\* \* \* if [a purchaser] had asked for a 'Keen Kutter,' the salesman would be compelled to ask whether the customer wanted a knife, a saw, a razor, scissors, or some other Simmons product."

In the case at bar, it has already been noted that there is no relation between the meaning of "Riverbank" as applied to testing services and tuning forks and the meaning of "Riverbank" as applied to sound insulating doors, and it is almost belaboring the point to note that there is absolutely no relationship between cryptographic services and sound insulating doors. Where products or services are related, as in the Enders case, and one name is applied to them all, it is unlikely that the relevant buying public will understand the name as a generic designation for but one of the products. But where the products or services are unrelated, as in the case at bar, this likelihood is dissipated.

 Fourth, plaintiff argues that the name "Riverbank," as applied to doors, was fanciful and not descriptive of doors or of acoustical or construction properties. Although this argument is factually correct, it is irrelevant. A fanciful name, not inherently descriptive of quality, function or properties, may become generic. The names "Singer" and "aspirin," as applied to sewing machines and medicaments, respectively, were fanciful and not inherently descriptive. However, each name was held to be generic. Singer Mfg. Co. v. June Mfg. Co., 1896, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118; Bayer Co. v. United Drug Co., D.C.S.D.N.Y.1921, 272 F. 505. It is true that descriptive words are within the broader category of generic words. Speaker v. Shaler Co., 7 Cir., 1937, 87 F.2d 985, 987, certiorari denied 1937, 301 U.S. 695, 57 S.Ct. 923, 81 L. Ed. 1350. However, the latter is not limited to the former, and the issue remains one of fact.

 Fifth, plaintiff argues that the defendant regarded the name as non-generic by securing trade-mark rights therein. However, plaintiff places too much emphasis on the inferences to be drawn from defendant's action. The securing of a trade-mark was a result of Ludlow's suggestion and was initiated without the benefit of legal advice. There is not the slightest reason for inferring from the record that defendant was aware of all possible legal inferences which might be drawn from its action, or that defendant intended its action to be regarded as indicating its opinion that the name was not generic.

 Finally, plaintiff advances the argument, factually correct, that, following the abortive injunction issued earlier in these proceedings, defendant successfully marketed the door without using the name "Riverbank." Consequently, plaintiff concludes, the name is not intimately associated with the door by the relevant buying public, and is not generic. That a product is marketed under names other than the one in suit is evidence, not necessarily conclusive, that the name in suit is not generic. 1 Nims, Unfair Competition and Trade-Marks, p. 583 (1947). Plaintiff's position would be factually far stronger had defendant, upon expiration of the agreement, successfully marketed the door under another name, *with nothing more*. However, defendant was restrained from accepting orders in which the door was referred to as "Riverbank" and, as a result, informed the relevant buying public by letter that it was changing the name of the door to "Hardwood." Hence, plaintiff's argument loses substantially all of its force and effect.

In summary, plaintiff's arguments are insufficient to counteract the finding of fact that the name "Riverbank" is generic. This conclusion renders it unnecessary to decide (1) whether defendant has any special equities in the name "Riverbank"; (2) the effect of plaintiff's agreement with Armour; (3) whether plaintiff abandoned the name "Riverbank"; and (4) whether defendant has

a right to the name as a result of adverse use.

Defendant seeks to have the court enjoin plaintiff and its officers, agents and employees from asserting exclusive rights to the name "Riverbank." I do not believe that an injunction is necessary. Plaintiff has unsuccessfully litigated its claim to exclusive rights and there is no reason to assume that plaintiff will continue to assert its claim. This relief will be denied.

Defendant urges that attorneys' fees be assessed against plaintiff. Assuming that attorneys' fees may be assessed against an unsuccessful plaintiff in an exceptional case (compare Aladin Mfg. Co. v. Mantle Lamp Co. of America, 7 Cir., 1941, 116 F.2d 708, in which plaintiff was awarded attorneys' fees where defendant-infringer's conduct was grossly tortious), the case at bar is not so exceptional as to warrant such assessment. Although plaintiff has not prevailed in this action, the action is not so baseless as defendant suggests. Nor is there any reason to infer from the record that plaintiff's action was "an imposition on the Court and ruthless persecution of its benefactor, all in a wilful and calculated attempt to unlawfully extend a patent monopoly." (Def.Br., p. 33.) Defendant's request is denied. See Philco Corp. v. F. & B. Mfg. Co., D.C.N.D.Ill.1949, 86 F.Supp. 81; Century Distilling Co. v. Continental Distilling Corp., D.C.E.D.Pa.1951, 102 F. Supp. 39, affirmed 3 Cir., 1953, 205 F.2d 1940, certiorari denied 1953, 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400.

Throughout the pendency of this case defendant has maintained an offer to cancel its trade-mark. Since I have concluded that the name "Riverbank" is the generic appellation for the sound insulating door invented by Dr. Sabine, I am of the opinion that defendant should be, and is hereby, ordered to cancel its registration of the trade-mark. In all other respects, entry of judgment in favor of defendant is directed. Plaintiff will bear the costs of the action.

The foregoing memorandum of decision contains the findings of fact and conclusions of law required under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Judgment will be entered in favor of the defendant and against the plaintiff with costs assessed against the plaintiff.